REILLY *et al.* v. THE HANNIBAL & ST. JOSEPH RAILROAD COMPANY, *Appellant.*

1. **Railroads**: NEGLIGENCE: MASTER AND SERVANT: SCOPE OF EMPLOYMENT: KNOWLEDGE OF MASTER. In an action by parents against a railroad company for negligently killing their minor child with a switch engine, while carrying certain of the company's employes from the roundhouse to their meals, where the defence is, that such use of the engine was not in the business of the company and was without its knowledge and consent, evidence that the engine had been so used in an open and notorious manner from six weeks to three months, with the knowledge of the yardmaster, and that the superintendent had frequently seen it so used, and was in a position to know all about it, is sufficient to justify the court in submitting to the jury whether such use was known to the company and acquiesced in by it, and whether when so used the engine was engaged in the business of the company.

2. ——: ——. The running of a railroad engine on a track in a street of a city, in daylight, at a speed of from eight to twenty miles an hour, where those in charge failed to see an infant on the track until within seven or eight feet of it, and until too late to stop the engine, is gross negligence.

3. **Negligence:** INFANTS, CARE OF BY PARENTS. Whether the act of a mother in leaving her infant child, sixteen months old, in one room of the house, while she went into an adjoining room to perform some labor, where the child shortly thereafter wandered out of the house and yard, and on to the railroad track in the street in front of them, and was killed by a passing engine, was negligence on her part is a question for the jury, under proper instructions.

4. ―――: PRACTICE: EVIDENCE. The mother is a competent witness in an action by parents to recover damages for the killing of their minor child.

5. **Practice:** INSTRUCTIONS. One party will not be heard to complain of the other's instructions, where his own announced the same doctrine, although it be erroneous.

6. ―――: ―――. Instructions should be taken as a whole, and when so taken they fairly embrace the law applicable to the case, in a manner not calculated to mislead the jury, they will not be held erroneous, even though subject to verbal criticism.

7. **Master and Servant:** NEGLIGENCE: SCOPE OF SERVANT'S EMPLOYMENT. The master cannot be held responsible for the negligent act of his servant, unless done in and about the business of the master, or unless the act in the doing of which the negligence occurs is sanctioned or authorized by him.

*Appeal from Monroe Circuit Court.* — HON. THEO. BRACE, Judge.

'AFFIRMED.

*Prosser Ray, R. F. Walker* and *Strong & Mosman* for appellant.

(1) Mrs. Reilly being the wife of her co-plaintiff was incompetent to testify. 1 Wharton's Evid., sec. 130; *Lucas v. Brooks*, 18 Wall. 452; *Kelly v. Drew*, 12 Allen, 109. (2) Defendant entrusted its switch engine for switching purposes in its yards to its yardmaster. (3) At the time of the injury switch engine No. 13 was not being run upon that business, or any other business of defendant, or under the direction or authority of the yardmaster. (4) Defendant had otherwise reserved all

control over its engines while in the yards or on the road to its superintendent or train dispatcher. (5) Defendant had not intrusted L. M. Ham with an engine to be run by him upon any of its business, either in its yards or on its railroad. (6) Much less had he been intrusted therewith to be run for his own personal ends. (7) The journey to supper, in course of which the accident occurred, was not entered upon for any purpose of defendant, and, therefore, defendant had not set in motion the agency producing the injury. (8) If a servant drives the master's team or runs his engine for an end and object exclusively his own, the master is not liable for an injury resulting therefrom. (9) Where the servant, at the time of the act resulting in injury, claims to act for himself and not for the master, and is not then engaged in the master's business, liability, like Mohammed's coffin, is suspended in the air—rests on nothing. Whittaker's Smith on Negligence, 135; Wood on M. & S. 555, 594; 2 Hilliard on Torts [3 Ed.] 423–7; 2 Wood on Railroads, 121; Patterson's Ry. Accident Law, 100; *Crosgrove v. Ogden*, 49 N. Y. 258.

*R. E. Anderson* for respondents.

(1) The husband and wife were properly permitted to testify because they were co-plaintiffs, parties in interest. The antique doctrine of public policy prohibited all parties from testifying, even when they had no interest, and were nominal parties. They were disqualified *qua* parties and irrespective of interest. *De Wolf v. Johnson*, 10 Wheat. 367, *385; *Scott v. Lloyd*, 12 Pet. 145, 149. (2) It was the duty of defendant to know how its track, on Collier street, was being used, and to know how engine 13 was being used, and protect the public from unauthorized use of each, and when the said use of said track and of engine 13 persisted long enough to enable a person of ordinary care

and prudence, in charge of the affairs of said company, to become aware thereof, such use became of itself notice to the defendant, and the defendant's failure to arrest the use is of itself sufficient proof that the defendant authorized and consented to it. *Scoville v. Glasner*, 79 Mo. 449; *Edwards v. Thomas*, 66 Mo. 468; *Hall v. Railroad.*, 74 Mo. 302. (3) No reason is seen why the defendant could not make it its business to transport its operatives to and from their meals. Such action could not be *ultra vires*. The defendant has as much power to specially transport its operatives to and from their meals, as it would have to carry a lot of section hands to and from their meals, and by a persistent sufferance of this kind of service, the defendant can and will in fact make it a part of its business whether so intended or not. *Harper v. Railroad*, 47 Mo. 567. (4) There was no contributory negligence in the case. *Frick v. Railroad*, 75 Mo. 542, 608; *Farris v. Railroad*, 80 Mo. 325; *Donahoe v. Railroad*, 83 Mo. 612.

NORTON, C. J.—This suit was instituted in the Hannibal court of common pleas by plaintiffs to recover damages for the death of their infant son, aged sixteen months, alleged to have been occasioned by the negligence of defendant in running a switch engine over Collier street in the city of Hannibal. The venue of the cause was changed to Monroe county, where upon a trial plaintiffs had judgment for five thousand dollars, from which the defendant has appealed, and assigns as the chief ground of error the action of the court in refusing to sustain a demurrer to the evidence and in giving and refusing instructions.

The evidence tends to show the following facts: That the track of defendant's road is laid on Collier street, in the city of Hannibal, which runs east and west, and is intersected by Fourth, Fifth, Sixth, and Seventh.

streets, which run north and south; that plaintiffs lived on a lot south of, and abutting on, said Collier street; that their house stood several feet back from the street, and was enclosed with a fence, in which there was a gate opening out on the street; that between this gate and the railroad track there was a space of several feet. It further appears that plaintiffs, at the time of the accident, had five children, aged respectively twelve, ten, five, and three and a half years, the youngest son, Willie, who was killed, being sixteen months old; that plaintiffs had several cows and sold milk; that the accident occurred about six o'clock in the evening; that plaintiffs had milked their cows and the father was driving them to the pasture, and the two oldest children had been sent with milk to their customers; that the mother, after giving Willie, the youngest child, in the front room of the house, a cup of bread and milk, left him eating a piece of bread, and went into an adjoining room to strain milk, and in about five minutes was informed that the child had been run over and killed by one of defendant's engines; she testified that she did not know whether the door of the house and the gate were open or not; that she did not miss the child till informed of his death.

It further appears that the child, after being thus left, wandered out of the house on to the street and defendant's track, and sat down on the end of a tie on the south side of the track, eating a piece of bread; that while sitting there, he was beheaded by one of defendant's locomotives or switch engines running at a speed variously estimated by the witnesses to be from eight to twenty miles an hour. The evidence also tended to show that when the engine had approached within ninety or a hundred yards of the place where the child was, two men in a wagon on the south side of Collier street, seeing the dangerous situation of the child, warned those on the engine of the danger, one of them testifying that, as the engine was passing in sixteen feet

of them he threw up his hands, and hallooed as loud as he could, "that they would run over the child;" "there is a child on the track;" "look out for the child;" that the men on the engine did not pay any attention; that he hallooed loud enough to be heard thirty yards; that the engine was running fifteen miles an hour; that he could not see the spokes of the driving-wheels, that they looked solid; that the wagon he was on, as well as the engine, made considerable noise; that neither bell was rung nor whistle sounded.

The evidence is clear that there was nothing to prevent those in charge of the engine from seeing the child had they looked. It is also shown that switch engine No. 13, which beheaded the son of plaintiff, was, at the time the accident occurred, being run for the purpose of carrying Mr. Ham, in the employ of defendant as foreman of the roundhouse, and assistant master mechanic, out to his supper on Lyon street, between Ninth and Tenth streets where he lived. The evidence further shows that, for six weeks or more previous to the accident, this switch engine had been run at least twice a day out on Collier street to Eleventh street, a little over one mile, for the purpose of carrying Ham and other employes of defendant back and forth to their meals, down in the morning to the shops, back at noon to dinner and back again to supper, and then down to the shops; that it was run under the management of Ham; that Ham was on the engine with Wilson as engineer and Graham as fireman; that Wilson's eyes were very poor; that the week before he had been in St. Louis under care of Dr. Green, an oculist; that he had been laid off almost two years on account of his eyes. The evidence tended to show that Ham, under his employment, had no control over the movement of switch engines after they left the roundhouse; that the exclusive right to control the movements of all engines after they left the roundhouse was in the yardmaster

of the switch engines ,while in the yards, and train dispatcher and superintendent after they leave the yards.

Mr. Lessner, the night yardmaster, testified that he saw switch engine 13 go out, and Wilson as engineer and Graham, fireman, and several others were in it; that the engine was used to carry Ham to his supper; that he never reported to the yardmaster, Moore, of the detentions caused by the use of the engine to carry Ham to his meals; that he thought Moore had seen the use of the engine, as his opportunities were good; that he never reported the fact to superintendent Woodward, because he thought it was Moore's business to do so. He further stated that he had no authority as night yardmaster to send engine 13 out on Collier street for any purpose other than for switching and making up trains; that he did not know whether Moore, as day yardmaster, had such authority, and could not say whether he could have stopped Ham in such use of the engine.

Woodward, a witness on part of defendant, testified that, in 1879, he was superintendent of the road; that his office-hours in Hannibal were from nine o'clock in the morning till five o'clock in the evening; that he and general manager, Carson, were the only officers of defendant with authority to permit employes at the car-shop, or roundhouse to be carried on an engine from the yards to the west part of the city for their meals; that such an order from Carson would have to pass through his office; that he never gave Ham any permission to use an engine to transport him back and forth to his meals, and that, up to the time of the accident, he did not know that the engine had been so used; that neither the night nor day yardmaster had authority to permit Ham to use an engine for any such purpose; that he generally went to his meals between half-past twelve and half-past one o'clock; that, in passing over the track, he could see an engine on the track a half mile in

a western direction ; that he had seen the engine hundreds of times in going to, and back from, his meals, but knowing that they were doing work in the yards would say nothing ; that he would hardly ever see an engine go up there but there would be a half dozen persons on it. He was asked if he knew what the people were doing, who were on the engine at the time he saw them, to which he answered he did not ; and, in answer to the question, if they were employes of the road, and what their object was in being transported, he thought some were employes, and that their object was to get to ride as near home as possible. He further stated that it was the duty of the agent and the yardmasters to know to what uses the switch engines were put ; that up to that time he never called for any report, and never received any as to how the main track was being used.

Graham, the fireman, testified that the track was clear ; that his attention was attracted to some teams at Seventh street crossing, which was beyond where the child was sitting, and that he happened to cast his eye down nearer than he had been looking and saw the child only seven or eight feet distant. Wilson, the engineer, testified that they started out to take Ham home ; that they had no switching to do out where they were going, and that he did not see the child until it was run over ; that after he got over the Sixth street crossing, thirty or forty yards, Ham hallooed to him to stop, after which he did all he could to stop ; that he had no permission from the general manager, superintendent, or train dispatcher to take Ham out to his meals ; the permission he had was from Ham.

Ham testified that the engine made the runs to carry him home, and went at his request, and that it did no other business on that trip ; that he had no contract with the company to be carried to his meals ; that he had no permission from Carson or Woodward for such use of

the engine, and that Woodward and Carson had no knowledge of such use that he knew of.

It is insisted that the court erred in not sustaining a demurrer to this evidence. A demurrer to evidence admits the facts which it establishes or tends to establish, as well as all inferences which may be fairly drawn from them; and in view of the fact that the evidence clearly shows that the use to which said engine had been put by the employes of defendant, for from six weeks to three months before the son of plaintiff was killed, was a notorious fact well known to the employes of defendant, including the night and day yardmasters, and in view of the further fact that, while the superintendent of the company testified that the use to which the engine was put was without his authority or knowledge, he, in point of fact, was in a position to know all about it, and stated in his evidence that he had frequently seen the employes and others riding on the engine, and that their object was to get to ride as near their homes as possible, the inference can be fairly drawn that such use of the engine was acquiesced in or consented to by the company. Proof of the notoriety of a fact is competent to show notice or knowledge of it by another. *Crane v. Railroad,* 87 Mo. 588.

"He who has knowledge of facts sufficient to put him upon inquiry, is chargeable with notice of the fact which inquiry would disclose." *Eyerman v. Bank,* 84 Mo. 408; *Fellows v. Wise,* 55 Mo. 413; *Cornett v. Bertelsman,* 61 Mo. 118. The general office of this defendant was at Hannibal. Its general superintendent and general manager had offices there; one of them lived at Palmyra and made his office-hours from nine o'clock in the morning till five o'clock in the evening; the other lived at Quincy and was frequently in Hannibal. These facts, in connection with the further fact that this switch engine had, according to the evidence, been used from six weeks to three months previous to the accident in

transporting Ham, foreman of the roundhouse and assistant master mechanic, and other employes, back and forth to their meals, and that such fact was notorious, justified the court in submitting, as it did, the question to the jury, as to whether such use of the engine was known to the company and acquiesced in or consented to by it, and whether, in assenting to such use, the employes so using it were engaged in the business of the company.

If it had appeared in evidence that the company had agreed with Ham and other employes, in employing them, to transport them back and forth to their meals in the switch engine, no question, we apprehend, could have been raised but that such use would be in the business of the company. It is manifest, from the facts in evidence, that the life of the child was sacrificed through gross carelessness of those running the locomotive, and the court could not have taken the case from the jury on the ground that such negligence occasioned the injury, nor could the court have declared, as a matter of law, that the negligence of plaintiffs was the proximate cause of the injury and taken the case from the jury on that ground.

As to whether, after setting a cup of bread and milk on a chair before the child, the act of the mother in leaving him while he was eating, and going into an adjoining room to strain milk was or not negligence on her part, was for the jury under proper instructions. She, as a prudent person, might well have supposed that the attraction of his frugal meal would be sufficient to keep him there during her absence, or that if he left it it would be to follow her into the room she went into. *Petty v. Railroad*, 88 Mo. 306 ; *Drain v. Railroad*, 86 Mo. 574.

It is insisted that the court erred in allowing Mrs. Reilly to testify, she being a co-plaintiff with her

husband. It is expressly stated in the case of *Bell v. Railroad*, 86 Mo. 599, that in such cases as this the wife is a competent witness.

Various objections are made to the instructions, and among them it is urged that the court erred in giving the two following instructions of its own motion :

"8. Before the jury can find for the plaintiffs in this action, they must establish, by a preponderance of the evidence, that their child was killed by an engine being run at the time not only by servants, agents, or employes of the defendant, but also that it was being run upon the business of the defendant, or that said engine was at the time being run by the defendant's authority."

"13. Before the jury can find for the plaintiffs in this action, they must establish, by a preponderance of the evidence, that their child was killed by an engine being run, not only by servants or agents of defendant, but also that it was being run, at the time the child was killed, upon the business of defendant, and if the jury believe, from the evidence, that the engine was being run for the purpose only of conveying Mr. Ham, the foreman of the roundhouse, out to the western part of the city of Hannibal, for his own purposes and personal convenience after quitting his work for the day, and not upon the business of the company, then the defendant is not liable, and the verdict must be for the defendant, unless such use of said engine was authorized by the defendant."

It is claimed that these instructions are erroneous because there was no evidence tending to show that the engine when the child was killed was being run on the business of the company. The objection cannot prevail, for the reason that the record shows that defendant asked the court to give two instructions couched in the language used in those given by the court, with the exception that in the first instruction the court added the

words, " or that said engine at said time was being run by defendant's authority," and in adding to the second the words, "unless such use of said engine was authorized by the defendant." Besides this, defendant asked, and the court gave, two instructions requiring the jury, before they could find for plaintiffs, to find, either that the engine was being run in the business of defendant, or that defendant authorized the engine to be used in carrying Ham to his home. It is too late for defendant, after having thus invited the court to give such instructions, to insist that the court erred in complying with the request. It is settled, in the following cases, that one party cannot be allowed to complain of another's instructions where his own announced the same doctrine, although it be erroneous. *Thorp v. Railroad*, 89 Mo. 650; *Holmes v. Braidwood*, 82 Mo. 610; *McGonigle v. Daugherty*, 71 Mo. 259; *Smith v. Culligan*, 74 Mo. 388; *Davis v. Brown*, 67 Mo. 315.

The question as to whether the plaintiffs or either of them were guilty of such contributory negligence as would prevent a recovery, as well as the question whether the death of plaintiffs' son was occasioned by the negligence of defendant's servants, while either engaged in the business of the master, or while using the engine by his authority, were all fairly submitted to the jury. Taking the instructions as a whole, as we must do (56 Mo. 289; 52 Mo. 626, and cases cited; 43 Mo. 586), while they may be subject to verbal criticism, the law applicable to the case was fairly embraced in them, and in a way not calculated to mislead the jury. They recognize the correctness of the doctrine that a master is not responsible for the negligent act of his servant unless done in and about the business of the master, or unless the act in the doing of which the negligence occurs is sanctioned or authorized by him.

We discover no error justifying an interference with the judgment, and it is hereby affirmed. All concur, except Ray, J., absent.