STATE OF MISSOURI upon the information of ROY McKITTRICK, Attorney General, Relator, v. CARL F. WYMORE, Prosecuting Attorney of Cole County.—132 S. W. (2d) 979.

Court en Banc, October 17, 1939.

170

*Roy McKittrick,* Attorney General, *Franklin E. Reagan* and *Max Wasserman,* Assistant Attorneys General, for relator.

172

*John G. Madden, Alfred Kuraner* and *Madden, Freeman & Madden* for respondent.

GANTT, J.—Original action in *quo warranto*. On August 24, 1937, the Attorney General filed in this court an information in which it is alleged that on and since January 1, 1937, the respondent Carl F. Wymore was the prosecuting attorney of Cole County, and as such charged with the duty of enforcing the criminal laws of this State; that on January 1, 1937, and since said date slot machines, punch boards, pin ball machines, marble machines, race horse machines, cigarette machines, dice machines and other illegal devices and schemes were operated in said county in violation of law; that said violations were open, notorious and known to respondent; that respondent was requested to prosecute criminal actions against persons violating said law; that he willfully and corruptly failed to do so, and willfully and corruptly failed to prosecute criminal actions in said county; that respondent, in permitting the operation of said gambling devices colluded with others unknown to relator, and that by failing to prosecute persons violating said laws he forfeited his office of prosecuting attorney. Relator prayed that he be ousted from said office and that the same be declared vacant.

We heretofore ruled that this court has jurisdiction to determine the questions presented by the information filed in this cause. [State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S. W. (2d) 941.]

174

Respondent's answer specifically denied the allegations of the information. The cause was referred to a commissioner to take testimony and report his findings of fact and conclusions of law. On November 21, 1938, the commissioner commenced to take testimony. By agreement of counsel, testimony was taken from time to time and completed on March 10, 1939. On May 3, 1939, the commissioner filed his report in which he recommended that respondent be found not guilty.

Respondent's two year term as prosecuting attorney expired December 31, 1938. He was reelected and is now serving his second term beginning January 1, 1939.

I. He contends that "since the term of office sought to be forfeited has expired by operation of law, this proceeding is moot and should be dismissed."

The question of the removal of a public officer for misconduct during a previous term is considered in Vol. 17, American Law Reports, page 279. The authorities are divided on the question. In the view we take, it will not be necessary to consider the question. It is reserved. The curious may consult the annotation in A. L. R.

In this connection it should be stated that we have ruled in *quo warranto* actions originating in the circuit court on the relation of a private person that, if the term of office has expired, the action must be prosecuted to final judgment. The ruling may rest on the statutory provision that after the institution of the action it cannot be dismissed without the consent of the relator. We do not consider the question.

We now are confronted with the question as to whether or not there remains an issue in the case. Of course, if there is an issue, it is not a moot case. In ruling the question we will, in the instant case, accept the view of respondent that the forfeiture, if any, was *ipso facto* and occurred as of the date of the filling of the information on August 24, 1937, and prior thereto. Under the common law the rule is stated as follows:

"It frequently happens that the term of the office the right to which is the subject of controversy expires before the proceedings are concluded and the right determined, and the question then presented is whether the proceedings must fail or proceed to judgment, though the respondent is not in the office and therefore cannot, strictly speaking, be ousted therefrom. The courts quite generally hold that where the proceedings have been commenced during the term of office for which the relator claims to have been elected, the proceedings will not be dismissed, though such term expires prior to judgment in the proceedings. Ordinarily the object of the proceedings is more than to oust the incumbent. In most jurisdictions a fine may, in the discretion of the court, be imposed, and costs may be recovered against the respondent, should he be found guilty;" (2 Bailey, Extraordinary Remedies, pp. 1294, 1295).

We ruled in Hunter v. Chandler, 45 Mo. 452, that where the action to remove an official for misconduct was begun before the term expired, the action should be prosecuted to a final judgment. We also ruled in State ex rel. Barrett, v. Bank, 297 Mo. 397, 414, 415, 416, 249 S. W. 619, that the character of judgment in *quo warranto* cases is largely within the discretion of the court.

Furthermore, we ruled that in *quo warranto* cases this court may impose a fine for usurpation. The question was considered in Standard Oil Co. v. Missouri, 224 U. S. 270, l. c. 283, 284, 285. In that case this court entered a judgment of ouster against the Standard Oil Company, Republic Oil Company, and the Waters-Pierce Oil Company and fined each fifty thousand dollars. Some of the members of the court expressed the opinion that each should be fined one million dollars. It was contended in the Supreme Court of the United States that this court was without jurisdiction to impose a fine on the companies. In an interesting opinion said court ruled as follows:

"In Missouri, and prior to the decision in this case, the rulings were to the effect that the Supreme Court of Missouri had jurisdiction not only to oust but to impose a substantial fine in *quo warranto.*

"In 1865, under a Constitution which, like the present, conferred power 'to issue writs of *quo warranto* and hear and determine the same,' the court tried the case of State ex inf. v. Bernoudy, 36 Mo. 279, brought against the clerk of a Circuit Court for usurpation of the office. There was a prayer for judgment of ouster and costs. The court said:

" 'No evidence is offered to charge the defendant with any evil intent, and it being probable that he acted from mistaken views only, the court will not avail itself of the power given by law, to impose a fine on him, and will compel him to pay the costs only of this proceeding.'

"In 1902, in State v. Armour Packing Co. et al., 173 Mo. 356, 395, information in the nature of *quo warranto* was filed in the Supreme Court against three corporations, praying that their franchises be forfeited because they had formed and maintained a conspiracy in restraint of trade. The court held that, 'under the circumstances, the judgment of absolute ouster is not necessary, but the needs of justice will be satisfied by the imposition of a fine.' It thereupon adjudged that each of the defendants should pay the sum of $5,000 as a fine, together with the costs of court.

"In State ex inf. v. Delmar Jockey Club, 200 Mo. 34, *quo warranto* was brought to forfeit the charter of the company, because it had violated a criminal statute prohibiting the sale of pools on horse races. A judgment of ouster was entered and a fine of $5,000 was imposed. On rehearing the judgment was amended and the provision for a fine omitted. Evidently this was not for want of jurisdiction

to impose such sentence, but because it was considered that ouster was all that was demanded by the facts. This appears from the fact that in the present case the court adopted the language of the original Delmar decision, in which it was said that the fine is imposed for a violation of the corporation's implied contract not to violate the franchise granted by the State (218 Mo. 360). So that, whatever may be the rule elsewhere, in Missouri a corporation may in *quo warranto* be subjected to a money judgment—whether called a fine as punishment—or damages for its implied contract not to violate its franchise.''

The rule is stated in a standard text as follows:

''The propriety of imposing a fine in addition to judgment of ouster is usually regarded as a matter of sound judicial discretion, and when no improper motives are alleged or shown against the party ousted, the fine imposed will be merely nominal.'' [High, Extraordinary Remedies (3 Ed.), p. 702.]

Furthermore, in State ex inf. Attorney General v. McAdoo, 36 Mo. 453, for usurpation of office, there was judgment of ouster with a statement as follows: ''Having no evidence that he acted from any other than mistaken views, we forbear imposing any fine on him, and only order that he pay the costs.''

Thus it appears that if respondent is guilty, he may be fined for usurpation from August 24, 1937, to the end of his term, December 31, 1938.

II. Respondent next contends that the evidence is not sufficient to sustain a finding that he is guilty of official misconduct.

The evidence shows that during the year 1937, and prior to the filing of the information, approximately two hundred and fifty machines, consisting of slot machines, punch boards, pin hole machines, marble machines, race horse machines, cigarette machines, dice machines and other illegal devices were operated in approximately one hundred and thirty places in Cole County. The machines received from one cent to twenty-five cent coins. They were in hotel lobbies, public eating places, taverns, drug stores, cafes, gasoline filling stations and other places, and, with few exceptions, were in plain view of the public. In a few places the machines were in the rear part of the business room, divided by an open partition.

They were openly operated from January 1, 1937, until some time in August, 1937. Occasionally, in response to alarm given, they would disappear until assured of safety. One man controlled about eighty per cent of the machines. Another man controlled about fifteen per cent of the machines. The balance were controlled by the owner of the business. Approximately ninety per cent of the machines were in the city. In other words, the city was plastered with machines. From time to time the man in control would call, remove the money from the machines and divide equally between himself and the own-

er of the business. There may have been, and no doubt were, other machines in the city and county.

The conditions with reference to gambling devices were such that the local newspaper, in issues of January 23, 26 and 27, 1937, published articles with reference to the matter. In substance, it was stated that the machines were "in hiding;" that the "order went around Sunday for them to close;" "that they were under lock and key;" that the public was wondering whether the shooting of a gambler by another gambler or the approaching grand jury caused the disappearance of the machines; that the law-enforcing officers stated that they did not know of the operation of machines; that they knew of no order "to hide" the machines; that an officer stated that he had not learned about the matter "officially;" that the sheriff was as much "in the dark" about the operation of machines as the chief of police; that the sheriff will pick the members of the next grand jury, to be impaneled on February 1, 1937.

We have ruled that evidence of the notoriety of an existing fact is admissible to prove that another has knowledge of the fact. [Crane v. Mo. Pac. Ry. Co., 87 Mo. 588; Conover v. Berdine, 69 Mo. 125; Reilly v. H. & St. J. Ry. Co., 94 Mo. 600, 7 S. W. 407.] It was so ruled in Clark v. Ricker, 14 N. H. 44; Milbank v. Dennistoun, 23 N. Y. Super. 382; Gaskell v. Morris, 7 Watts & S. Pa. 32; 22 C. J. 285. Respondent in his points and authorities did not assign error on the admission of this evidence.

At the close of the evidence respondent, who was not cross-examined as a witness, dictated a statement into the record. He stated "that acting upon rumor and unverifiable information that gambling devices were in operation in Cole County," he requested the circuit judge to specially charge the grand jury with reference to the matter; that the circuit judge cooperated with him by charging the grand jury as follows:

"You are further charged to investigate all violations of the criminal statutes in regard to gambling and the keeping and operation of gambling devices. You are to go diligently into this whole matter and do your whole duty without fear or favor."

Respondent further stated that he submitted to the grand jury the information in his possession with reference to the operation of gambling devices, and called all witnesses known to him who might give testimony with reference to the matter; that he cooperated with the grand jury in the discharge of its duties in connection with the investigation; that the grand jury interrogated the city and county "law investigating agencies," many private citizens and newspaper reporters with reference to the operation of gambling devices; that the grand jury publicly stated that any citizen having knowledge of crime should advise the grand jury.

Respondent further stated that the grand jury filed its final report in May, 1937; that during the life of the grand jury he caused two "raids" to be conducted by the "law-enforcing officers;" that the evidence obtained by said "raids" was submitted to the grand jury; that the grand jury, in finding no true bills, reported:

". . . Throughout the entire session of this grand jury we have kept in mind the fact that it is a waste of the county's money to find indictments upon evidence which we, the grand jury, may not reasonably expect to justify a conviction upon a trial being had in the circuit court.

"We have investigated every report that has been brought to our attention by either the county authorities or by private citizens and in no instance have we found sufficient evidence upon which to return an indictment *for a major crime.*" (Italics ours.)

Could the grand jury have considered the operation of the gambling machines only a minor crime? Could this be the reason that no indictments were returned for the open violation of the statute prohibiting the operation of the machines?

The local newspaper again became active with reference to gambling devices. In issues of June 18, July 19 and August 17, 1937, articles were published with reference to the matter. In substance, it was stated that while the grand jury was in session, the gambling machines "were kept under cover;" that they had been "running full blast" since the adjournment of the grand jury; that the Governor stated as follows: "Every slot machine in the State should be smashed. The whole law-enforcement of the State is threatened. Tolerance of the racket demoralizes the peace officers and operators of the machines. The machines are fixed and the players cannot win. The gamblers place the machines where children and people unable financially to gamble have easy access to them."

The articles further stated that the failure of the local police to act in the matter is explained by the fact that it has not received orders from "higher up;" that county authorities are awaiting orders; that respondent said he had given no thought to asking the aid of the Attorney General; that he said a "half dozen slots" seized in raids during the session of the grand jury were in care of the sheriff; that prior to August 17, 1937, the law-enforcement officers had done nothing about gambling; that machines were operated everywhere; that gambling dens were running openly and notoriously; that the good people of the county had protested in vain.

Respondent further stated that he received communications from a highway patrolman of Lebanon, Mo., with reference to the matter (which communications will be detailed in the testimony of the highway patrolman); that on August 23, 1937, he received a letter from state officials enclosing a form of search warrant and a list of one hundred places in which machines were operated; that on receipt

of the letter he "organized all of the law-investigating and law-enforcing agencies of the city and county and carried out the directions contained in the letter;" that prior to the time he received the letter, information with reference thereto was given to the public press and for that reason the "search and seizure raids" failed to produce any evidence of violations of the law; that he submitted to the next grand jury a part of the transcript of the testimony taken in the instant action; that no action had as yet been taken thereon by the grand jury; *that no request was ever made to him by any person to file a complaint or otherwise institute a prosecution for violations of the law;* that he never refused to file a complaint tendered to him by any person for any violations of the law.

The evidence further shows that the highway patrolman investigated the operation of machines in the city and county June 21 to June 29, inclusive, 1937. He found machines in operation in approximately one hundred and thirty places. He and another patrolman revisited seven of the places and observed the machines in operation. On July 1, 1937, he made a written report to the state officials with reference to the matter. On August 16, 1937, while in Jefferson City he dictated a letter to respondent dated Lebanon, Mo., and in person delivered the same to him in his office. In the letter he stated that over a period of time from June 21, 1937, he observed the operation of machines in eleven named places of business. At that time he did not tell respondent of other places in which machines were operated. On the same date, August 16, 1937, respondent, by special delivery mail, addressed a letter to the highway patrolman at Lebanon. In the letter respondent acknowledged receipt of said patrolman's letter of August 16. He thanked him for the information and suggested that he call and sign a complaint charging said persons with violations of the law. On August 17, 1937, said patrolman delivered respondent's letter to the Highway Patrol office in Jefferson City. At that time said patrolman was advised by his superior to take no further action in the matter until further orders. On August 21, 1937, said patrolman was called to Jefferson City. On that date he dictated a letter at Jefferson City purporting to be written at Lebanon, in which he acknowledged receipt of respondent's letter of August 16. In the letter he offered to testify as to the facts set forth in his letter of August 16. He declined to sign a complaint and stated it was his understanding that a prosecuting attorney could file a charge on information and belief. He further stated in the letter that on August 13, 1937, the machines were still in operation in five of said places in Jefferson City. This letter was mailed at Lebanon at 5:30 p. m. August 22, 1937, and received by respondent on August 23, 1937. On August 24, 1937, the State commenced the instant action.

The operation of slot machines is punishable by imprisonment in the penitentiary for a term of not less than two nor more than five years,

or by imprisonment in the county jail for a term not less than six nor more than twelve months. [Sec. 4287, R. S. 1929.]

In view of the penalty, it is not conceivable that men in control would "plaster" the city with machines unless they had an understanding with the prosecuting attorney and other law-enforcement officers. Furthermore, it is not conceivable that men would consent to the operation of machines in business places unless convinced that the person in control of the machines had an understanding with such officers. From this there is no escaping the conclusion that those in control of the machines had an understanding with such officers. If so, respondent had actual knowledge of the operation of the machines, and he is guilty of official misconduct.

Furthermore, assuming there was no arrangement, we are confronted with the fact that respondent's residence and office are in the city. Of course, it could be possible that during the time of the machine invasion, respondent did not see even one machine. But in view of the fact that he was compelled to go about the city to some extent, and in view of the fact that he is not blind, we do not believe that it could be possible for him to have been ignorant of the invasion of the city by gambling devices. It is not contended that the machines were so constructed that an enforcement officer, on approaching, would be temporarily blinded. We think that it should be inferred from the evidence that respondent saw machines in the city. If so, he had actual knowledge of the invasion and is guilty of official misconduct.

Furthermore, if we assume there was no understanding and that respondent did not see machines in the city, we are confronted with the fact that he had an abundance of information that the city had been "plastered" with machines. The local newspaper in numerous issues was alive with references to the matter. He read the article, for he caused the reporters to be subpoenaed before the grand jury.

Under the circumstances he should have strolled about the city. In doing so he should have looked his fellowmen in the face and occasionally made an observation to determine if the charges made in the newspaper were true or false. He did nothing of the kind. On the contrary, he rested on the honors that had been conferred on him by the people of the county. He made no effort whatsoever to perform his duties as prosecuting attorney. It is clear that he had information which would cause a faithful prosecuting attorney to at least make a casual investigation. For this he is guilty of official misconduct.

Respondent argues that it was no part of his duty to be a detective.

We agree that it is not the duty of a prosecuting attorney to spy into other people's business. However, there is no foundation for the detective argument. Respondent has eyes to see, ears to hear

and the ability to move among the people who honored him with the office. The city was "plastered" with openly operated machines. The unfortunates who played the machines were not detectives, and in locating the machines performed no part of the work of a detective.

He also argues that he is a quasi-judicial official, and as such vested with discretion in the performance of duty.

We also agree that in performing his duties he is authorized to exercise a sound discretion. However, "there is nothing sacred about the words quasi-judicial." In Ex parte Bentine, 196 N. W. 213, 215, 181 Wis. 579, it was correctly ruled as follows:

"A public prosecutor is a 'quasi-judicial' officer, retained by the public for the prosecution of persons accused of crime, in the exercise of sound discretion to distinguish between the guilty and the innocent, between the certainly and the doubtfully guilty."

Of necessity, "in distinguishing between the certainly and doubtfully guilty," the prosecuting attorney should make a reasonable effort to discover witnesses and interview them with reference to the facts. After doing so he should give careful consideration to both the law and the facts before determining the question of prosecution or no prosecution. He has no arbitrary discretion, and sound discretion is usable as a refuge for unfaithful prosecuting attorneys.

The rule is stated as follows:

"It is the duty of the prosecuting attorney to initiate proceedings against parties whom he knows, or has reason to believe, have committed crimes. . . . The fact that his duties rise to the dignity of exercising discretion cannot excuse neglect of duty on his part. . . .

"The contention made by the appellant is to the effect that, because a wide discretion is vested in the prosecuting attorney with reference to the prosecutions of parties for crime, the right of discretion must necessarily shield him from indictment or prosecution for omission to perform his duties. This court takes a contrary view of the law. It is the duty of the prosecuting attorney, under the statute, though endowed with discretion in the performance of his duties, to exercise his discretionary powers in good faith." [Speer v. State, 198 S. W. 113, 114, 115.]

There also is no foundation for the quasi-judicial argument. The evidence conclusively shows that respondent never reached the point where he even pretended to exercise discretion. He did reach the point where he became excited and mailed a letter to the highway patrolman by special delivery. In doing so he manifested a guilty conscience.

In addition a highway patrolman, on August 16, 1937, furnished respondent with a written list of places in which machines were in operation. Other evidence shows that machines were in operation almost under respondent's nose. On presentation of this list he could,

182

with a minimum of exertion, have made at least a partial investigation of the matter within thirty minutes. Instead of doing so, he directed a letter to said patrolman suggesting that he call at respondent's office and sign a written complaint, under the statute authorizing private persons to do so. He had no "itching" to make an investigation of the matter.

Respondent also argues that in the exercise of discretion he is authorized to institute prosecutions by either information or indictment.

We also agree that he has no such discretion if exercised in good faith. In this connection we direct attention to the statement of respondent that, acting upon rumor and unverifiable information that machines were in operation, he requested the circuit court to charge the grand jury of February 1, 1937, with particular reference thereto. If the information was "unverifiable," it would be a joke to submit it to the grand jury.

The grand jury was selected by the sheriff, an enforcement officer. It found no true bills. In doing so it reported to the court that it had in mind the fact that it would be a waste of county money to find indictments on evidence which would not be sufficient to convict a defendant in the circuit court. The evidence in the instant case shows that, at the time the grand jury made its report, the city was full of men and women who knew of the operation of machines in the city. We do not pause to either discuss or consider this report. It speaks for itself.

If we blushingly assume that respondent, in the exercise of discretion, performed his full duty by submitting the matter to the grand jury, nevertheless he is confronted with the fact that on the adjournment of the grand jury the machines reappeared and continued in operation until driven from the city and county in August, 1937, by the State officials. Certainly it would not be contended that respondent did not abuse his "grand jury discretion" by permitting the reappearance and operation of the machines until they were driven from the city and county by said officials.

He also argues that he was not compelled to sign, swear to and file complaints.

We also agree that he is not compelled to do so. He may and should exercise an honest discretion in determining if he should make and file a complaint. Under Section 3467, Revised Statutes 1929, he is not required to have "first hand knowledge" to be qualified to make a complaint. [State v. Frazier, 339 Mo. 966, 98 S. W. (2d) 707, 712; State v. Layton, 332 Mo. 216, 58 S. W. (2d) 454, 457.] In this connection respondent stated "that no request was ever made to him by any person to file a complaint or otherwise institute a prosecution for violation of the law." He thereby admitted that he was authorized to make complaints.

At this point it should be stated that in the briefs the parties argue at length as to whether the filing of a complaint or the filing of an information is the commencement of a prosecution. We have ruled both ways on the question. [State v. Sassaman, 214 Mo. 695, l. c. 722, 114 S. W. 590; State v. Nichols, 330 Mo. 114, l. c. 124, 49 S. W. (2d) 14; Carp v. Queen Ins. Co., 203 Mo. 295, 101 S. W. 78; State v. Bithorn, 278 S. W. 695; State v. Criddle, 302 Mo. 634, 259 S. W. 429.]

It will not be necessary to consider the above noted conflict, for it is provided in Section 11316, Revised Statutes 1929, that "the prosecuting attorneys shall commence and prosecute all . . . criminal actions in their respective counties. . . ." The section does not enter into detail about the duties of a prosecuting attorney. In this situation the rule is stated as follows:

"The duties of a public office include those lying fairly within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those which, although incidental and collateral, serve to promote the accomplishment of the principal purposes." [46 C. J., sec. 301, p. 1035.]

"The rule respecting such powers is, that in addition to the powers expressly given by statute to an officer or a board of officers, he or it has, by implication, such additional powers, as are necessary for the due and efficient exercise of the powers expresssly granted, or as may be fairly implied from the statute granting the express powers." [Throop's Public Officers, sec. 542, p. 515.]

"Necessary implications and intendments from the language employed in a statute may be resorted to to ascertain the legislative intent where the statute is not explicit, but they can never be permitted to contradict the expressed intent of the statute or to defeat its purpose. That which is implied in a statute is as much a part of it as that which is expressed. A statutory grant of a power or right carries with it, by implication, everything necessary to carry out the power or right and make it effectual and complete, but powers specifically conferred cannot be extended by implication." [59 C. J., sec. 575, pp. 972, 973; Hudgins v. Mooresville Consol. School Dist., 278 S. W. 769, 312 Mo. 1; State ex rel. Wahl v. Speer, 223 S. W. 655, 284 Mo. 45; Ex parte Sanford, 139 S. W. 376, 236 Mo. 665.]

Under the rule, if it is the statutory duty of a prosecuting attorney to commence and prosecute criminal actions, by necessary implication, he should qualify himself to determine, in the exercise of an honest discretion, if a prosecution should be commenced. The only way he can determine the question is to make an investigation of the facts and applicable law. If he determines there should be a prosecution, and determines, in the exercise of an honest discretion, that he should proceed by information, also, by necessary implication, it is his duty to do whatever is necessary, under the law, to authorize the

filing of the information. In making an investigation he qualifies himself to make and swear to the information.

The people of this State are not idiots. They know that a prosecuting attorney cannot, under his oath of office, hide behind Section 3505, Revised Statute 1929, which authorizes private persons to file complaints with the clerk of the circuit court or with the prosecuting attorney. If he could do so; the law-abiding citizens of the State would be helpless and at the mercy of the "underworld." It is well known that private persons rarely file complaints. They may subject themselves to costs and the hazard of an action for malicious prosecution. If a private person files a complaint, the prosecuting attorney is not compelled, for that reason, to file an information. However, it is his duty to make a reasonable investigation and then determine if an information should be filed.

In this connection it should be stated that respondent submitted a part of the transcript of the evidence taken before the commissioner to the "next grand jury" (grand jury of Feb. 1, 1938). The transcript contained the names of many men who testified before the commissioner that machines had been in operation in their business places and that they were placed therein by either one or two men. Although respondent knew of this testimony, he made and filed no complaint. On the contrary, he hid behind a submission of the transcript to the grand jury where it faded away. For aught that appears, no indictments were returned on the theory that it would be a waste of county money.

Respondent is guilty of a failure to faithfully demean himself in office and should be ousted.

■ We now approach the question of punishment. We hesitatingly do so. Respondent is a young man who should be on the open and "above board" highway which leads to an honorable finish. He is under the influence of evil men. The evidence considered, he is under the ruthless and withering influence of evil men in relatively high positions. Under such baneful influences he is not free to enforce the criminal law. We wonder if he is in a position to resist said influences. It may be that he should be given an opportunity to convince the law-abiding citizens of this State that he can and will be a good citizen and faithful public servant. He must overcome his subjection to the dictatorial influences of these evil manipulators. If he does so, we have no doubt of the result. We now hopefully take the chance. He is ousted from the office of prosecuting attorney as of August 24, 1937, and until the end of his first term. For the usurpation of said office from said date until the end of said term he is fined one dollar and taxed all of the costs of this action. *Tipton, C. J., Hays* and *Douglas, JJ.,* concur; *Ellison, Leedy* and *Clark, JJ.,* concur in result only.