STATE OF MISSOURI ex inf. JOHN M. DALTON, Attorney General, Relator, v. ARTHUR C. MOSLEY, Respondent, No. 43977—286 S. W. (2d) 721.

Court en Banc, January 9, 1956.

Motion for Rehearing Overruled in Per Curiam Opinion Filed, February 13, 1956.

712

*John M. Dalton*, Attorney General, *Robert R. Welborn* and *Fred L. Howard*, Assistant Attorneys General, for relator.

*Walter Wehrle, Hyman G. Stein* and *Herbert W. Ziercher* for respondent.

714

[722] LEEDY, C. J.—This is an original proceeding in quo warranto instituted by the Attorney General against respondent to determine the latter's title to the office claimed by him, that of Sheriff of St. Louis County. The information charges that respondent has been guilty of willful and fraudulent violation and neglect of his official duties, and has knowingly failed and refused to do or perform official acts and duties which by law it was his duty to do or perform with respect to the execution and enforcement of the criminal laws,

and by reason of his having been guilty of willful and malicious oppression, partiality, misconduct and abuse of authority in his official capacity and under color of his office as sheriff, respondent has forfeited his said office, and notwithstanding such forfeiture he has unlawfully usurped and continues to hold said office. The relief sought is a determination of the forfeiture, and that respondent be ousted. Hon. William H. Becker of Columbia was appointed as Special Commissioner to hear the evidence, and report his findings of fact and conclusions of law. The duty thus enjoined upon the Special Commissioner was carried out with painstaking care and signal ability, as his comprehensive report attests.

Before the issues were joined respondent, by motion, sought leave to file a plea attacking this court's jurisdiction over the subject matter of the action. The motion was summarily overruled on the theory (although not so stated in the order) that the question sought to be raised was no longer an open one. Notwithstanding this, and as his first point, respondent reasserts such want of jurisdiction, and, being a question that can be raised at any stage of a proceeding, we have examined it anew, and have reached the same conclusion as that which compelled the withholding of leave in the first instance. The present attack is based on the same ground as that formerly sought to be tendered, i. e., that the statutory scheme with respect to forfeiture of office and the removal of incumbents not subject to impeachment, nor within the exception engrafted upon Art. VII, § 4, of the Constitution (RSMo 1949, §§ 106.220—106.290, VAMS), constitutes an exclusive remedy, and hence this court is deprived of jurisdiction in quo warranto affecting such offices. It was held in State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W. 2d 941, 119 A.L.R. 710, that these very statutes (then known and numbered as §§ 11202—11209, RSMo 1929) did not constitute an exclusive remedy, and did not limit the jurisdiction of the Supreme Court in quo warranto, and that the latter would lie to determine the title of a prosecuting attorney (whose office had allegedly been forfeited by reason of misconduct) notwithstanding statutory provisions for the removal of officials for misconduct. The doctrine of the Wymore case was expressly [723] reaffirmed in State ex inf. Taylor v. Cumpton, 362 Mo. 199, 209, 240 S.W. 2d 877, 883, and in State ex inf. Saunders v. Burgess, 364 Mo. 548, 264 S.W. 2d 339, 341.

Respondent contends that these cases are distinguishable from, and, therefore, not controlling in, the case at bar for these reasons: Because the Wymore case was decided prior to the adoption of the present Constitution, and the provision there involved was worded differently from the section of the new Constitution here invoked; and because the other two cases, although decided subsequent to the adoption of our new Constitution, did not consider or pass on the point now urged, which, reduced to its simplest terms, is that the statutory

remedy is made exclusive by force of Art. VII, § 4, of the Constitution, reading as follows: "Except as provided in this Constitution, all officers not subject to impeachment shall be subject to removal from office in the manner and for the causes provided by law." Respondent would construe this language as if it read thus (to quote his brief): "[E]xcept 'as provided' in this Constitution, removal actions against officers not subject to impeachment 'shall' be in 'the manner * * * provided by law.'" This interpretation omits consideration of, and renders nugatory, the key words ("subject to") in the declaration that officers affected by said provision "shall be *subject to* removal * * * in the manner * * * provided by law."

The majority opinion in the Wymore case regarded the text of the constitutional provision there in question (from which Art. VII, § 4, the particular section now under scrutiny, is derived) as reading thus: "The General Assembly shall, in addition to other penalties, provide for the removal from office of county, city, town and township officers, on conviction of willful, corrupt or fraudulent violation or neglect of official duty. *Laws may be enacted to provide for the removal from office, for cause, of all public officers, not otherwise provided for in this Constitution.*" (Art. XIV, § 7, Const. of 1875, as amended.) It may be said in passing that the present writer concurred in the result reached by the principal opinion in the Wymore case in a separate concurring opinion, in which concurring opinion two other judges concurred, our view being that all portions of the foregoing section had been eliminated by prior amendment save and except that language which we have italicized above, and hence the question of exclusiveness of the remedy was not in the case. But the prevailing or majority view was otherwise, as above stated, and when so considered—as it should be because settled by that decision—we are unable to discern any real difference in meaning and effect between it and the corresponding section of the present Constitution, Art. VII, § 4, so that as regards the claim of exclusiveness of the statutory remedy, this case stands on the same footing as, and is controlled by the doctrine of, the Wymore case, in consequence of which the jurisdictional question raised by respondent is ruled against him.

Relator relied on ten specific charges, which the Special Commissioner's report summarizes as follows:

"1. *The Whiskey 'Hijacking' Charge.* This charge concerned the theft and recovery of a truck load of whiskey stolen in St. Louis County in November of 1952 and recovered in the County in December, 1952. The charge in substance was (a) that the Respondent Sheriff was derelict in his duty to investigate the crime and recover the whiskey, and (b) that the Sheriff hampered an investigation of the identity of the thieves and their accomplices by refusing Deputies Burke and Mueller the possession of photographs of suspects for display to prospective witnesses in the field.

"2. *The Reward Charge.* This was in substance a charge that after recovery of the stolen whiskey, the Respondent Sheriff demanded and received personally a check for a portion of the reward offered by the [724] insurer of the stolen whiskey. It is charged that in so doing the Sheriff violated Section 558.140, R.S. Mo. 1949.

"3. *The Charge Concerning the El Avion Shooting and Deputy Nick Burke's Escape.* The substance of this charge is that Deputy Sheriff Nicholas Burke shot and wounded Deputy Sheriff William Smith at a party at which the Respondent Sheriff was present; that in violation of his duty to pursue and arrest felons, the Respondent Sheriff failed to make any attempt whatsoever to arrest Deputy Burke at that time; that Deputy Burke was allowed to depart the scene without hindrance.

"4. *The Carnival Gambling Charge.* This was a charge that in St. Louis County illegal gambling flourished openly at carnivals sponsored by various organizations; that this gambling was notorious and that widespread publicity was given the illegal gambling; that despite the extent, the illegality, and the notoriety, the Respondent Sheriff failed to enforce the gambling laws until after the institution of this action.

"5. *The Abortion Case Shakedown Charge.* This was a charge that the Respondent Sheriff participated in the arrest of an abortionist and later in the acceptance by one of his deputies of a $1,500.00 bribe from an abortionist to cause the prosecuting witness to leave the County and the prosecution to fail.

"6. *Charge of Failure to Enforce the Liquor Control Law.* The substance of this charge is that the violations of the Liquor Control Act in St. Louis County from 1950 to August 7, 1953, were widespread, open, and notorious, and that the Respondent knowingly and willfully failed to enforce the Liquor Control Law and ordered his deputies if they observed a liquor law violation to take no action but report to the Respondent Sheriff.

"7. *The Shamrock Inn Charge.* The substance of the charge is that the Respondent Sheriff failed to do his duty to investigate and act on complaints that gambling laws were being violated at the Shamrock Inn and Silver Leaf Bar, located in Breckenridge Hills, a village in St. Louis County.

"8. *The 'Big Charlie' and 'Little Charlie' Gambling Charge.* This charge is that the Sheriff's office failed to act on complaints of operation of gambling games known as 'Big Charlie' and 'Little Charlie' in three taverns located in University City.

"9. *The Drift Inn and Mac's Pool Room Charge.* This charge is that the Respondent Sheriff failed to enforce the gambling and liquor laws being violated at a pool room and tavern on North Elm Street, in an unincorporated area of St. Louis County.

720.

"10. *The Elmwood Park Gambling Charge.* This is a charge that the Respondent Sheriff failed to suppress gambling in the streets in Elmwood Park, a densely settled unincorporated area in St. Louis County."

Insofar as presently relevant, respondent's answer and return admitted the averments concerning his election, qualification and tenure of office as Sheriff of St. Louis County, denied all charges of misconduct and failure to perform his duties, and affirmatively averred that he had at all times faithfully performed his duties as sheriff.

Lengthy hearings were held before the Special Commissioner as evidenced by the fact that the transcript returned by him contains the testimony of 347 witnesses and 216 exhibits, and consists of 4192 pages of testimony in some 30 volumes. The Special Commissioner concluded that the evidence was such that respondent should be absolved of all charges except two, i. e., the carnival gambling charge and the reward charge. His recommendation was that the judgment be not one of ouster, but that as to the carnival gambling charge, respondent should be reprimanded for his failure to enforce the laws against gambling and lotteries for charitable, civic and municipal purposes from the beginning of his present term, January 1, 1953, to the date of the institution of this proceeding, August 7, 1953; and as to the reward charge, it was **[725]** recommended that respondent be fined $500.00, taxed with one-half the costs, and admonished that the demanding of such rewards for the performance of official duty will henceforth be punished by ouster. Both sides filed lengthy exceptions to the report, relator's consisting of 41 separate items, and respondent's 9. We are satisfied with the correctness of all his findings of fact, but the view we take of the law renders it unnecessary that any of the facts be reviewed except those in relation to the two charges last mentioned.

At the expense of brevity, but in the interest of clarity and understanding of the posture of the case at this stage of the proceedings, we set forth below, in full, the Commissioner's findings of fact and conclusions of law with respect to the carnival gambling, as follows:

### The Carnival Gambling Charge

"From roots reaching backward in time so far they are not visible in this record there flourished in St. Louis County illegal gambling at public gatherings and the operation of illegal lotteries for charitable purposes from 1948 to 1953, inclusive (and up until August 7, 1953, when this suit was filed). From 1948, until the time of the filing of this suit, a large number of the well known civic, religious, fraternal, patriotic, and municipal organizations openly conducted public 'carnivals' at which many recognized types of forbidden gambling games were operated, including dice games, bingo games, poker games, chuck-a-luck, wheels of chance, and lotteries at which valuable prizes were awarded. These valuable prizes consisted of money, automo-

biles, finished and furnished homes, home appliances, and other merchandise and goods. In the games, cash prizes were usually awarded, although at times, some of the more reticent rewarded the player (who paid cash) with merchandise prizes. All net receipts from these gambling operations were used for charitable, civic, fraternal, religious, or patriotic purposes.

"During this period there was practically no attempt to conceal the operation or illegal nature of the games played or lotteries operated at the carnivals. This record discloses a few but ineffectual attempts to give the illegal lotteries a legal form by such devices as noting on the lottery ticket that the price paid was a 'donation,' or by pretending that the lottery ticket holder had been elected to a fictitious office to which the prize was attached as a salary. But, by and large, the gambling games and lotteries were conducted openly without concealment and with an apparent belief that the law would not be enforced against gambling and lotteries conducted for municipal, religious, charitable, fraternal, civic, or patriotic purposes. The existence of these illegal operations troubled the public conscience of St. Louis County to such an extent that in the September Term, 1948, the grand jury, impanelled by the Circuit Court for that term, took cognizance of the existence of these illegal operations and undertook to formulate a 'carnival code' which would be enforceable.

"The pertinent portion of the grand jury report is as follows:

" 'We have given close attention to the conduct of carnivals in the County, at which various types of gambling operations were permitted. We are cognizant of the impossibility of securing convictions of citizens of no previous criminal character who have violated the gambling code by operating a carnival for a purely charitable purpose. We recognize, too, the temptation to professional gamblers to frequent or associate themselves with charitable carnivals where games with which they are well acquainted are operated. Nevertheless, regardless of the charitable nature of such enterprises, when such gambling operations are permitted, even though minors and children are not permitted to participate, it sets a very bad example to the young and gives them instruction in gambling.

" 'With these thoughts in mind, we suggest that dice games, card games, chuck-a-luck and roulette should be absolutely prohibited, and the operators of carnivals should be warned that the use of such gambling paraphernalia will result in the [726] issuance of information against the operators thereof and the seizure and destruction of the equipment described. Because this paraphernalia is costly, the seizure and destruction of it would be a lesson to the operators not easily forgotten, and would serve as a warning to other carnival operators ambitious to engage in like action that they would suffer a tremendous financial loss. We ask the police in the various municipalities where carnivals are operated, to serve warnings that gam-

blers or other police characters seen on the premises will be arrested and held for the statutory period. As we recognize that the American people seek the milder forms of taking a chance, as an inducement to contribute to charities, we believe that the giving of groceries and prizes other than cash should be tolerated. In this matter we have contacted the organization of the Peace Officers of St. Louis County, and we are gratified to find that they agree fully with our views in this matter, and that they, together with various St. Louis County groups who hold carnivals for whatever purpose, have been earnestly seeking some guide as to what could or could not be permitted at carnivals. For the guidance of all parties therefore, we suggest the following Carnival Code to exclude at least this handful of obvious gambling devices and games:

"'1. No Roulette.

"'2. No Chuck-a-luck.

"'3. No Over and Under.

"'4. No Games Involving Dice.

"'5. No Games using Ordinary Playing Cards or Poker Chips.

"'6. No Cash Prizes.

"'We commend the Peace Officers Association for the assurance that its members would enforce this Carnival Code throughout the County of St. Louis, and we further commend the City Council of Kirkwood for anticipating this action of our Grand Jury in already prohibiting such devices.'

"This grand jury carnival code undertook to direct the law enforcing officers concerning what types of violations should be prosecuted and what types might go unprosecuted. There was no legal authority for the grand jury's action in rewriting, in effect, the laws concerning gambling and lotteries for application in St. Louis County. Nevertheless, the grand jury was made up of substantial and public spirited citizens who were doing their best to bring about suppression of the more notorious aspects of gambling for charitable purposes. The Respondent Sheriff and the Prosecuting Attorney served notice generally that the grand jury's carnival code would be enforced and that gambling in contravention of the carnival code would not be tolerated in the future. The carnival code was widely publicized by a local St. Louis County publication (The St. Louis County Observer) which had previously conducted a campaign of publicity against gambling at public gatherings. Following the grand jury's prescribing the carnival code, the Respondent, among other peace officers, approved the carnival code as a guide to law enforcement. Subsequent grand juries took note of the existence of the code and some instances of its breach.

"Despite the carnival code and the good resolutions which accompanied it, neither the carnival code or the underlying state laws against so-called carnival gambling and lotteries, conducted for

charitable purposes, were observed or enforced. Direct and circumstantial evidence shows that the Respondent was aware that illegal gambling and illegal lotteries were conducted openly and notoriously and to great extent thoughout the succeeding years of 1949, 1950, 1951, 1952, and 1953, up to the filing of this action.

"The evidence shows, and it is conceded, that the illegal gambling and the operation of illegal lotteries could have been suppressed by action of the Sheriff alone, or by action of the Sheriff and the Prosecuting Attorney.

"During the years 1949, 1950, 1951, 1952, and 1953, the St. Louis County Observer, the local publication which had made a public issue of the failure to enforce the gambling laws continued to publish news articles [727] concerning the existence of open gambling at carnivals and to criticize the law enforcement officers, county and municipal, for failure to enforce the laws and the carnival code.

"The organizations which continued to violate the laws against gambling and lotteries included some of the most worthy civic, religious, fraternal, patriotic, and municipal organizations in the County. The conduct of the gambling and lotteries for charitable purposes involved some of the most respectable and substantial citizens of the County who happened to be serving as officers of the organizations engaged in the operations. The attitude of the churches whose auxiliaries conducted gambling and lotteries was interesting. The evidence shows that some of the churches forbade their members to engage in the conduct of gambling and lotteries on the ground that such conduct violated ecclesiastical law. Others tolerated the practice and even furnished buildings and grounds for the operations on the expressed ground that church policy did not forbid gambling of a lesser and non-injurious degree. The church officials did not apparently feel obliged to interpret and advocate enforcement of the secular law.

"There is no evidence in this record that the Respondent Sheriff or any of his deputies benefitted in a financial way from the operation of the gambling games and the lotteries. It can, on the other hand, be fairly inferred that the law enforcement officers would not suffer any net loss in political support by tolerating open and widespread illegal gambling and illegal lotteries by organizations with large membership. On the financial side, most of the fiscal officers of the organizations conducting the gambling and the lotteries kept careful accounts of the receipts and disbursements from their operations. Many of these accounts are in evidence.

"The evidence shows that in adjoining counties there were some similar violations of the law which fell far short of the open, widespread, and notorious conduct of gambling and lotteries for charitable purposes in St. Louis County from 1948 to the filing of this action.

"In St. Louis County by 1953, the conduct of gambling and illegal lottery enterprises by civic, religious, fraternal, patriotic, and municipal organizations had become the standard method of raising money for charitable purposes. Much of the burden of charity, public welfare, recreation for youth, and religious support, which is derived from voluntary donations in other communities, was derived from illegal gambling and lotteries in St. Louis County. One witness complained, and perhaps with reason, that the people of St. Louis County had become so conditioned by the practice that it was difficult to raise money for charitable purposes other than by gambling and lottery enterprises.

"As for the size of these illegal operations, some were small local picnics with ten cent gambling games accompanied by a lottery or drawing at which a grand prize or a home appliance or an automobile might be awarded. Other affairs were carnivals of considerable magnitude lasting several days and involving receipts of several thousands of dollars. In St. Louis County from 1948 to 1952, inclusive, a lottery of great magnitude was conducted in which a furnished home worth over fifteen thousand dollars was awarded annually, and lottery tickets were sold not only in St. Louis County and in Missouri, but in many other states of the Union. In the year 1953, the conduct of illegal gambling and lottery enterprises for 'charitable purposes' was open, notorious, and widespread. In the year 1953, the Respondent Sheriff knew of the existence of the open, notorious, and widespread illegal gambling and lottery enterprises, but nevertheless, willfully and knowingly failed to enforce the laws against gambling and lotteries until the filing of this action August 7, 1953.

"There is no evidence that the Sheriff otherwise failed to enforce the laws against gambling, and there is no evidence that he profited financially from gambling of any nature."

[728] *Conclusions of Law*

"1. No municipal, patriotic, civic, or religious organization has any license to violate the laws of the State against gambling or lotteries, regardless of the civic or charitable uses to be made of the profits or absence of personal profit to the organization or its members. Gambling and lotteries for charitable purposes are forbidden by law in Missouri. Unless and until the policy expressed in the laws against gambling and lotteries is changed by lawful procedures, the Respondent Sheriff, and all others charged with the duty of enforcing the laws, have a duty to suppress gambling and lotteries, conducted for any purpose and to enforce the laws against gambling and lotteries.

"2. The Respondent Sheriff was guilty of knowingly and willfully failing to enforce the laws of the State of Missouri against gambling and against operation of lotteries for charitable, civic, and municipal purposes from January 1, 1953, to August 7, 1953.

"3. The Respondent Sheriff's duties do not permit him to choose the criminal laws which he will enforce or the persons against whom he will enforce them.

"4. The Respondent in this proceeding cannot be punished for failure to enforce the laws in respect to carnival gambling occurring prior to January 1, 1953, the date upon which his present term of office commenced, and in view of the fact that this action was not instituted until August 7, 1953.

"5. With respect to carnival gambling, evidence of open, widespread, and notorious existence of carnival gambling in St. Louis County prior to January 1, 1953, was not admissible to prove dereliction of duty punishable in this case, but such evidence may be considered to prove knowledge of the nature and extent of such carnival gambling as continued to be conducted in the present term of Respondent beginning January 1, 1953.

"6. Because this is a case of first impression, and because no personal advantage, other than possible political favor, was received by the Respondent Sheriff as a result of failure to enforce the laws against gambling and lotteries for municipal, civic, and religious purposes, the Respondent should not be ousted as a result of such failure to enforce the law, but should be reprimanded."

### The Reward Charge

The reward charge is that respondent demanded and received personally a check for a portion of a reward offered by the insurer of a cargo of whiskey (625 cases) which was stolen on November 10, 1952, while in transit in St. Louis County, and later recovered. We set forth below, in somewhat abbreviated form, and without using quotation marks, the facts as found by the Special Commissioner, as follows:

The insurance carrier, The Agricultural Insurance Company, acting through its attorney in fact, Appleton and Cox, Inc., of New York and Chicago, advertised an offer of a reward of $2500 for the recovery of the property and the conviction of the thieves. Shortly following the recovery of the whiskey, Mueller and Burke, respondent's deputies, learning of the advertised reward, asked to be considered if it were paid.

Thereafter, the thieves having been apprehended, Harold Angell, Vice-President of Appleton and Cox, Inc., with offices in Chicago, determined to take action with respect to the payment of the reward. The agent in charge of the St. Louis office of the FBI was consulted by Angell, and the agent furnished the names of Burke and Mueller, as well as that of St. Louis Police Officer Judge, as being entitled to consideration in that connection. Thereafter, on June 8, Angell addressed and sent to Sheriff Mosley a letter enclosing a draft for $1000, payable jointly to Mueller and Burke. This was received about

June 10. Some days later, and the draft not having been delivered, Mueller (who was then in private business and no longer a deputy) went to the sheriff's office and conferred with the sheriff and Burke in reference to the matter. The sheriff showed Mueller and Burke [729] the letter and draft, and advised them that he felt that he was entitled to an equal share of the reward, and that he was going to communicate with the insurance company about the matter. He did not deliver the check to Burke and Mueller at that time, but put it back in his desk.

A few days later Mueller wrote a letter to Angell, which was received in due course, in which he stated that the sheriff was in receipt of the check for $1000, "but had refused to release the check to Mr. Burke or myself, insisting on an equal share for himself. * * * This has been refused and he is in turn holding up the check." The letter requested that the draft in the sheriff's possession be voided, and that separate checks be sent to Burke and Mueller at their home addresses. Mueller stated he was writing in Burke's behalf also because of the embarrassing situation in which Burke, still a deputy, found himself.

A few days after receiving the letter from Mueller, Angell, in Chicago, received a long distance call from Sheriff Mosley. The sheriff told Angell he had received the draft payable to Burke and Mueller, and wondered if Angell knew of the work he, the sheriff, had done. He told Angell that he had spent several nights watching the truck load of whiskey. Angell replied that he knew Burke and Mueller worked under the sheriff's direction, but did not realize that the sheriff had personally participated in the case or had done anything outside his normal duties. Angell said he would be glad to check into the matter, think it over and call the sheriff back. In the conversation the sheriff told Angell he still had the $1000 draft. He did not expressly ask for money, but said he felt the extra work he had done entitled him to consideration in the reward. Angell then consulted the New York office, and later telephoned the sheriff, and first suggested they might be able to send the sheriff another couple of hundred dollars. The sheriff said that was fine but let Angell know he would have been happier if the amount were more. The sheriff told Angell that Mueller was no longer with the sheriff's office, and perhaps the additional money to be sent to the sheriff might be pooled with Burke's share of $500. Angell objected, stating that his company was publicly committed to Mueller and Burke for $500 each, and that it would not be proper to ask either to accept less. Finally Angell agreed to send the sheriff an additional $500. Nothing was said at that time about a Deputy Sheriffs' Benefit Association. The additional draft in the sum of $500, payable to Sheriff Mosley, was mailed with a letter dated June 23, 1953, to Sheriff Mosley and received by him. The letter stated in part: "I am accordingly enclosing herewith draft #530079 payable to your good self in the amount

of $500.00 in token of our appreciation. This draft is being sent to you with the understanding that you will release our draft to Mr. Mueller and Mr. Burke.''

The sheriff received the $500 draft in due course, and on June 25 the draft for $1000 was delivered to and endorsed by Burke, and later cashed by Mueller and the proceeds distributed to those entitled thereto.

Thereafter, on July 8, the sheriff wrote a letter to Appleton and Cox, Inc., New York office, to Angell's attention, returning the $500 draft uncashed. This letter, which was prepared after consulting able counsel, stated in part:

''It was never my desire to participate in the reward personally. I had hoped the St. Louis County Deputy Sheriffs' Benefit Association might derive some benefit therefrom. If you choose so to do you may send a contribution to said Association in care of Mr. Earl Butenhoff, its Treasurer.

''Please understand there is no solicitation of a reward to the Association in this letter, as that is a matter entirely within your discretion.''

Concerning this mention of the Deputy Sheriffs' Benefit Association in the letter of July 8, the Special Commissioner reports that this ''was the first time it had been mentioned by the sheriff in the dealings with Angell, with Appleton and Cox, and with Burke and Mueller. The testimony in the record to the contrary is not credible.''

[730] When the letter of July 8 finally reached Angell in Chicago, Angell sent a $500 draft payable to the Benefit Association, as suggested.

Upon the facts thus found, the Special Commissioner reported as his conclusions of law the following:

### Conclusions of Law

''1. It is contrary to the statutory and common law of this State, founded on public policy, for an officer to solicit, demand, or receive a reward or fee for doing his duty. The observation of this rule of law is necessary to uniform administration of justice without discrimination or favor. When officers are permitted to accept or demand rewards for doing their duties, those who pay, willingly or unwillingly, will tend to receive greater attention to their complaints and requests for action, and those who do not pay will tend to receive less attention to their complaints and requests for action.

''The judgment in this case should contain an admonition to the Respondent and all other officers that the demanding of rewards or fees for the performance of official duty will henceforth be punished by ouster.

''2. The Respondent Sheriff is guilty of demanding a fee and reward by color of his office, for an official act done in the investigation and recovery of the whiskey stolen in St. Louis County, November 10,

1952, in violation of Section 558.140; and also is guilty of receiving and retaining for thirteen days a fee or reward in the form of a bankable draft for $500.00 for an official act done in the investigation and recovery of whiskey stolen in St. Louis County November 10, 1952.

"3. Because this is a case of first impression, and because the Respondent returned the $500.00 draft, the Respondent Sheriff should not be ousted, but should be fined $500.00 and taxed with one-half the costs of this proceeding. Section 558.130, R.S. Mo., 1949, does not as a matter of law require ouster because the Respondent demanded and received a reward in violation of Section 558.140, R.S. Mo., 1949.''

The Wymore case is the leading authority sanctioning this court's jurisdiction in quo warranto to determine forfeitures of office of the kind here in question notwithstanding the existence of statutes providing for removal of such officers, thus denying the exclusiveness of the latter remedy. Because of the extended treatment that case gives the nature, scope and effect of such quo warranto proceedings, and because controlling in the circumstances here present, we remind of what was there said (343 Mo. 98, 106-107, 119 S.W. 2d 941, 943), as follows:

"The writ [of quo warranto] is not directed against the individual claiming the office. It is directed against his right to hold the office. It is not an action in the interest of any individual. It is an action to protect the public against usurpation. 22 Stan. Ency. of Procedure, p. 25. The dominant issue in quo warranto is title. It proceeds on the theory that the office has been forfeited by an act of misconduct on the part of the official. On the other hand, removal concedes title and proceeds on the theory that the official either has not 'forfeited by the act forbidden' or has committed a criminal offense and subjected himself to punishment and forfeiture of the office on conviction. The courts are without authority to create and declare a forfeiture of office. Absent forfeiture at common law, the forfeiture can be created and declared only by either the constitution or valid legislative enactments. The rule is stated by standard texts as follows:

" 'Quo warranto will also lie for the purpose of ousting an incumbent whose title to the office has been forfeited by misconduct or other cause. And in such a case it is not necessary that the question of forfeiture should ever before have been presented to any court for judicial determination, but the court, having jurisdiction of the quo warranto proceeding, may determine the question of forfeiture for itself. The question must, however, be judicially determined [731] before he can be ousted. "And if the alleged ground for ousting the officer is that he has forfeited his office by reason of certain acts or omissions on his part, it must then be judicially determined, before the officer is ousted, that these acts or omissions of themselves work a forfeiture of the office. Mere misconduct, if it does not of itself work a forfeiture, is not sufficient. The court has no power to create

a forfeiture, and no power to declare a forfeiture where none already exists. The forfeiture must exist in fact before the action of quo warranto is commenced.'' ' Mechem, Public Officers, Sec. 478, p. 308. '' 'When the court has jurisdiction in quo warranto proceedings it may oust an incumbent from an office which he is holding without right, although the question of the right or of forfeiture, if that is in the case, has never before been presented to any court for judicial determination. The court which has original jurisdiction in quo warranto may determine the question of right or the question of forfeiture for itself, unless the statute provides that forfeiture shall follow a criminal prosecution and sentence, and if the act complained of does not ipso facto create a forfeiture, and is only a misdemeanor in office on account of which the law provides the manner in which the vacancy is to be declared, it is held that quo warranto will not lie.' Ency. of Pleading & Practice, Vol. 17, p. 400.''

State ex inf. McKittrick v. Murphy, 347 Mo. 484, 489-490, 148 S. W. 2d 527, 530, elaborates upon the foregoing doctrine in this language: ''It is also true that it [quo warranto] will lie against a county officer who has been legally elected or appointed to office in the first instance but has forfeited his office by misconduct. State ex inf. v. Graves, Mo.Sup., 144 S.W. 2d 91; State ex inf. v. Wymore, 345 Mo. 169, 132 S.W. 2d 979. But * * * the theory on which the writ is issued is that at the time of the filing of the information the franchise has ceased to exist and become forfeited because of the misconduct of its holder. The officer who violates his oath of office by corruption, wilful misconduct or neglect of official duty *automatically* loses the right to office *and becomes a mere interloper.* * * * In either case the judgment in quo warranto does not try the question of forfeiture. It merely recognizes judicially fait accompli and ousts the wrongdoer from enjoying the privileges of a franchise which he has ceased to possess.'' (Italics, the present writer's.)

§ 106.220 (all statutory references are to RSMo 1949 and the corresponding sections of VAMS) provides, among other things, that an officer such as sheriff ''* * * who shall knowingly or willfully fail or refuse to do or perform any official act or duty which by law it is his duty to do or perform with respect to the execution or enforcement of the criminal laws of the state, shall thereby forfeit his office * * *.''

As in the second Wymore case, 345 Mo. 169, 132 S.W. 2d 979, it is unnecessary to decide here whether respondent may be ousted from his present term because of misconduct arising in the one immediately preceding it, and we again reserve the question. And it may be added that no question has been raised as to the admissibility of evidence of widespread, open and notorious carnival gambling in respondent's former terms as bearing on his knowledge of the nature and extent thereof as continued in his present term.

▋ The evidence shows, as was found by the Special Commissioner, that respondent knowingly and willfully failed to enforce the laws of the State of Missouri against gambling and against operation of lotteries for charitable, civic and municipal purposes from the inception of his present term until at least the date of the filing of the information herein. By force of § 106.220, supra, and under the principles governing proceedings of this nature, as hereinabove set out, the conclusion is inescapable that respondent had automatically lost his right to the office of Sheriff of St. Louis County prior to the institution of this proceeding. The fact that respondent did not profit personally as a result of his lax and [732] complacent policy toward carnival gambling does not affect the matter. State ex inf. McKittrick v. Williams, 346 Mo. 1003, 144 S.W. 2d 98. And so having "forfeited by the act [or omission] forbidden," he became a usurper, and as such his ouster must go as a matter of course.

▋ As to the reward charge, we think it clear that the conduct complained of constituted a violation of § 558.140, which provides as follows: "Every officer who shall, by color of his office, unlawfully and willfuly exact or demand or receive any fee or reward to execute or do his duty, or for any official act done or to be done, that is not due, or more than is due, or before it is due, shall upon conviction be adjudged guilty of a misdemeanor."

It is provided by the next preceding section, § 558.130, that "* * * every officer who shall be convicted of any official misdemeanor or misconduct in office * * * shall, in addition to the other punishment prescribed for such offenses, forfeit his office." It is unnecessary to a decision on this branch of the proceeding to determine whether the doing of an act prohibited by § 558.140 ipso facto works the forfeiture thus provided for, or whether it arises only upon, and as a consequence of, conviction. In the nature of things, § 558.140 cannot apply to persons other than officers, and so it would seem clear that it is as much a part of the official duty of a sheriff to refrain from doing any of the acts denounced by that statute as it is to carry out what may be referred to as the affirmative duties respecting his office as expressly enjoined upon him by other sections. Consequently, the evidence brings respondent's actions in connection with the reward charge literally within the automatic forfeiture provisions of § 106.220, as for "willful or fraudulent violation or neglect of any official duty," so that, for this additional reason, ouster must be, and it is, awarded. Inasmuch as most of the charges against respondent were not sustained by the evidence (and some appear to have been made without substantial basis), and some presenting matters of first impression, and in view of the size and extent of the costs, we have concluded that all of them should not be borne by him. It is therefore ordered that the cost be taxed one-half against relator, and one-half against respondent.

*Dalton, Hollingsworth, Hyde,* and *Westhues, JJ.,* and *Cave,* Special Judge, concur; *Eager* and *Storckman, JJ.,* not sitting because not members of the court when cause was submitted.

■ PER CURIAM:—The motion for rehearing complains of the ruling that "having forfeited by the act [or omission] forbidden," respondent "became a usurper, and as such his ouster must go as a matter of course." It is charged that by so ruling the court has surrendered or denied its discretionary power with respect to the remedy or punishment it may order in a quo warranto proceeding. This is a misapprehension.

As regards the judgment to be entered in a quo warranto proceeding, we think a preexisting forfeiture of office for misconduct stands on a different footing than those instances where a private corporation is proceeded against for having improperly exercised some corporate franchise, or where the validity of the organization of some public corporation is questioned.

As was pointed out in Commonwealth v. Allen, 70 Pa. 465, 470, "The quo warranto is a great prerogative writ, and may be refused if demanded for light and trivial causes. Hence, in England, in questions of mere privilege, where its loss proceeds from innocent acts, as removal out of corporation limits, the court may and does let the corporation first declare the amotion. *But when a forfeiture of office occurs by an illegal act, the violation of law stands on a* [733] *different footing.* In such cases in this state the power of the court will not be invoked in vain by the law officer of the government, the attorney-general, whose duty it is to vindicate the broken law." (Italics, the present writer's.)

In State ex rel. Pope v. Mansfield Special Road District et al., 299 Mo. 663, 253 S.W. 714, 716, the judgment in quo warranto ousted the appellants from office as commissioners of a special road district, but also restored to or reserved in them such powers and duties as would enable them to continue to collect taxes and pay interest on outstanding bonds. This court in holding such judgment to be a nullity said: "If the act providing for the creation of the special road district was repealed by implication by the adoption by Wright county of township organization, then, in the absence of any qualifying legislation authorizing a retention of any of the powers of the district, it ceased to exist, and a judgment in quo warranto could do no more than give judicial recognition of its demise. A modified judgment of ouster therefore attempting to perpetuate its powers in any respect is a mere nullity."

What judgment less than ouster could properly be rendered where, as here, prior to the institution of the proceeding, there had been an automatic forfeiture of the officer's right to hold the office by reason of his willful misconduct or neglect of official duty, and in conse-

732

quence of which he had become an interloper—a usurper? We are not cited to any authority, nor do we know of any holding that such a person may nevertheless retain either title to, or possession of such office, under a proper judgment in a quo warranto proceeding. If anything said in State ex inf. Taylor v. Cumpton, 362 Mo. 199, 214, 240 S.W. 2d 877, 886 [13, 14], be regarded as holding to the contrary, the case should be, to that limited extent, overruled. It follows there was nothing improper, much less revolutionary, in our holding that upon the facts and law as found in this case, ouster would go as a matter of course.

Other questions presented by the motion have either been eliminated by our modification of the opinion this day made, or answered by the opinion itself, or they do not warrant discussion. The motion for rehearing is overruled.