**STATE ex inf. ATTORNEY GENERAL
of the State of Missouri,
Respondent,**

v.

**Peggy SHULL, Presiding Commissioner
of Clay County, Missouri,
Appellant.**

No. 76723.

Supreme Court of Missouri,
En Banc.

Nov. 22, 1994.

Reggie C. Giffin, Zoe K. Holmes, Tristan L. Duncan, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Sue A. Sperry, Judith Popper, Asst. Attys. Gen., Kansas City, for respondent.

ROBERTSON, Judge.

This is an appeal from a judgment of ouster entered in the circuit court following the filing of an information in the nature *quo warranto* by the Attorney General of Missouri charging a public officer with violating the anti-nepotism provision of article VII, section 6 of the Missouri Constitution. This Court has jurisdiction. Mo. Const. art. V, § 3. The judgment is affirmed.

## I.

The essential facts are undisputed though their meaning is strenuously contested. The people of Clay County, Missouri, elected Peggy Shull their presiding commissioner in November, 1990. A Republican, Shull assumed office in January, 1991. The Clay County Commission is composed of three persons elected by the voters of Clay County, Mo. Const. art. VI, § 7, two of whom are elected by the voters of each of the county's two districts and one of whom, the presiding commissioner, is elected at large. §§ 49.010 and 49.020, RSMo 1986.

On July 11, 1991, the commissioners decided to fill Clay County vacancies on the Board of Trustees of the Clay–Platte–Ray Mental Health Tax Levy Board. The western district commissioner, Rick Moore, moved to appoint two individuals to the Board of Trustees, one of whom, Norma Thomas, was Shull's sister-in-law. Moore and the eastern district commissioner, Jay Larson, voted in favor of the appointments. Shull cast the last vote, making the appointments unanimous. The parties agree that a sister-in-law is a relative within the fourth degree of affinity.

On March 16, 1993, the Attorney General filed his information in the nature of *quo warranto* in the Circuit Court of Clay County. The circuit court entered summary judgment in favor of the Attorney General on January 24, 1994, finding that Shull "technically" violated the anti-nepotism provisions of the constitution and ordered Shull ousted from office on January 31, 1994. That same date, the trial court sustained Shull's motion to fix supersedeas bond, setting it at $5,000, and stayed the execution of the ouster order. Shull filed the bond and appealed to this Court.

The Attorney General applied to the Court of Appeals, Western District, for a writ of prohibition against the trial court, urging that the judgment in *quo warranto* is self-executing and that neither a supersedeas bond nor a stay could allow Shull to remain in office pending appeal. The court of appeals issued a preliminary writ of prohibition on February 16, 1994, and made it absolute on February 24. Shull ·was removed from office and the Governor immediately appointed a Democratic male replacement.

## II.

This is summary judgment. The standards announced in *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation,* 854 S.W.2d 371 (Mo. banc 1993), apply. The reviewing court essentially reviews *de novo. Id.* at 376. Summary judgment is appropriate when the movant establishes that there is no genuine dispute as to material facts and that the movant is entitled to judgment as a matter of law. Rule 74.04(c)(3); *ITT,* 854 S.W.2d at 376.

### A.

Article VII, section 6, provides:

Any public officer or employee in this state who by virtue of his office or employment names or appoints to public office or employment any relative within the fourth degree, by consanguinity or affinity, shall thereby forfeit his office or employment.

Shull first argues that she did not violate article VII, section 6, because the two other commissioners had already cast a sufficient number of votes to assure the appointment of Thomas prior to Shull casting her vote. Thus, Shull's argument proceeds, she did not "appoint" Thomas and could not have violated the anti-nepotism provisions of the constitution. She relies on *State ex inf. McKittrick v. Whittle,* 333 Mo. 705, 63 S.W.2d 100 (1933), and *State ex rel. McKittrick v. Becker,* 336 Mo. 815, 81 S.W.2d 948 (1935), to support her position that unless her vote is the deciding one, she does not violate the constitution.

In the former case, Otto Whittle served as one member of a three-member board of education in Miller County. The board considered whether to appoint Whittle's first cousin as a teacher in the district. Whittle and another director cast votes in favor of the appointment; a third director voted against it. The Attorney General filed a *quo warranto* in this Court, seeking to oust Whittle for violating the anti-nepotism law.

The constitution then in effect provided: .

Any public officer or employee of this state or of any political subdivision thereof who shall, by virtue of said office or employment, *have the right to name or appoint* any person to render service to the State or to any political subdivision thereof, *and who shall name or appoint* to such service any relative within the fourth degree ... shall thereby forfeit his or her office or employment.

[Emphasis added.] Mo. Const. art. XIV, § 13 (1875) (as amended 1924). Whittle argued that only the school board had the "right to name or appoint" a teacher and that that power did not reside in Whittle as an individual member of the board. This Court rejected Whittle's argument, stating:

If at the time of the selection a member has the right (power), either by casting *a deciding vote* or otherwise, to name or appoint a person to office, and exercises said right (power) in favor of a relative within the prohibited degree, he violates the amendment.

[Emphasis added.] *Whittle,* 63 S.W.2d at 101–102.

In *Becker,* the judges of the Court of Appeals, Eastern District, wished to reappoint a court of appeals commissioner whose term had expired. One of the judges, Judge Hostetter, was related to the commissioner and declared that he would not vote in the appointment. The two remaining judges of the court of appeals declared that they would vote to reappoint the commissioner and would do so "free from any connivance, agreement, or conspiracy with ... Judge Hostetter or with each other, or with anyone else." *Becker,* 81 S.W.2d at 949.

The Attorney General sought a writ of prohibition to prevent the reappointment, urging that the anti-nepotism provision of the constitution prevented it. This Court denied the writ, stating:

[T]he essence of the [anti-nepotism] provision and likewise [the *Whittle* ] decision is *the power of appointment* vested in one *and the successful exercise thereof* by him in accomplishing the appointment of his relative. Action, direct or indirect, not inaction is prohibited.

[Emphasis added.] *Id.* 81 S.W.2d at 950.

Reading these cases together, Shull concludes that unless she cast "a deciding vote" (*Whittle* ) or successfully "exercised" the

power of appointment (*Becker*), she did not violate article VII, section 6. We disagree. First, the voters amended the constitution in 1945 to its present form. Second, the new constitutional language is more broad in its scope. *State ex inf. Graham v. Hurley*, 540 S.W.2d 20 (Mo. banc 1976).

In *Hurley*, the members of the county court (now called the commission) wished to appoint an ambulance service director. Judge (now called a commissioner) Adkisson nominated William Woods, Judge Hurley's son-in-law, to serve as the ambulance service director. Despite the initial objection of a third member of the county court, Judge Hurley's son-in-law received the appointment on an unanimous vote in which Judge Hurley participated.

Before this Court, Hurley argued that his vote was not the deciding vote and that he did not have the power to name or appoint his son-in-law, relying on *Whittle*. The Court found:

> [T]he nepotism provision interpreted in *Whittle* is different than our existing Art. VII, § 6.... In contrast to our present nepotism provision, the earlier provision required both that the officer or employee have the right to name or appoint and have exercised that right by naming or appointing.... [N]owhere in Art. VII, § 6 does it require that a deciding or necessary vote be cast. All that is required is that the naming be "by virtue of" appellant's office.

*Id.* at 25–26. The Court ruled that Hurley had forfeited his office by casting a vote in favor of his son-in-law's appointment as an ambulance service director.

■ Shull argues that *Hurley* is distinguishable from her case and, to the extent that it is not, urges that it be overruled. Although the precise facts of *Hurley* can be distinguished, the rule upon which *Hurley* relies cannot be. The constitution does not predicate the forfeiture of office on whether the public officer cast a deciding or necessary vote. Instead, a public officer violates the constitution when he or she appoints, by participating in the appointing process, a relative who is within the forbidden degree of relationship to public office. Shull participated in the appointment of her sister-in-law by

virtue of her office. In doing so, she violated article VII, section 6.

### B.

Next, Shull argues that the policy behind the constitution's anti-nepotism provision does not support her ouster in that her sister-in-law was both competent and qualified to hold the position and did not receive any compensation for her work on the board. We disagree.

■ The language of article VII, section 6, is clear and unambiguous. The text does not support Shull's policy argument. The constitution's words make no exception for public officials who appoint competent and qualified relatives to serve in public office without pay. Instead, the constitution makes the appointment of any relative within the prohibited relationship the basis for a forfeiture of office. That Norma Thomas was competent to hold her public office or received no compensation for her work is irrelevant to the constitutional inquiry.

### C.

Shull next contends that a judgment of ouster requires a showing of willful intent to violate the provisions of the constitution. She claims that she did not know that the constitution forbad her actions. Absent the intent to violate the constitution, she claims she cannot now be ousted.

■ We turn again to the clear language of the constitution. Article VII, section 6, contains no scienter element. Instead, it renders a public official who, by virtue of her office, participates in the appointment of a relative within the prohibited degree of relationship strictly liable for that act and requires forfeiture of her office. That a public official is not aware of the consequences of participating in the appointment of a relative to public office is of no constitutional significance.

### D.

The violation of article VII, section 6, notwithstanding, Shull argues that she cannot be ousted from office because she is the

target of selective enforcement of the anti-nepotism provision of the constitution by the Attorney General. For its premise, Shull's argument claims that technical violations of the anti-nepotism provision are commonplace throughout the state; she proceeds along her syllogism to argue that she is a Republican and a female, that the Attorney General is a Democrat and a male, and therefore that the Attorney General's decision to target her from among a plethora of violators is the product of politics and gender discrimination.

*Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), recognizes the selective enforcement defense rooted in the equal protection clause in criminal cases. This, however, is a civil case. Rule 98.02; *State ex inf. McNutt v. Northup,* 367 S.W.2d 512, 514 (Mo.1963). Neither Shull nor our independent research identifies a single appellate decision in which a court has accepted the defense of selective enforcement in a civil action.

Though not deciding the scope of the defense or its applicability in criminal or civil cases in this state, we nevertheless hold that selective enforcement is not a defense in a *quo warranto* action seeking to enforce sanctions for violations of constitutional prohibitions by public officials.

In this state, the Attorney General is popularly elected through a political process. Any time a political figure makes a decision contrary to the wishes of a public official claiming membership in a different political party, he or she is open to the charge that a decision is the product of political considerations. Whether the Attorney General allowed political considerations to influence his decision in this case is of no concern to article VII, section 6. Under the constitution, the relevant inquiry is limited to whether, by virtue of her office, a public official participated in appointing a relative within the prohibited degree of relationship to public office. If that inquiry is answered in the

affirmative, the motivations for the Attorney General's actions are inconsequential.

The point is denied.

### III.

Two issues remain, both of which require discussion because of the unusual proceedings in this case: First, may the court of appeals issue a writ of prohibition that relates to a case in which this Court has exclusive appellate jurisdiction under article V, section 3 of the constitution? Second, are the filing of a supersedeas bond and a trial court's stay order effective to stay an order of ouster pending appeal?

That the court of appeals had jurisdiction to issue original remedial writs is beyond doubt. Mo. Const. art. V, § 4. Recent amendments to Rule 84.22, however, assure that this Court will consider extraordinary writs that relate to cases in which this Court has exclusive appellate jurisdiction.

We turn to the second question. An inherent tension exists in *quo warranto* proceedings seeking the ouster of a public official. On the one hand, the voters have chosen an official to perform the duties of a public office. The voters are entitled to have that official fulfill those duties. Moreover, the official herself is entitled to exercise the functions of her office and to receive remuneration during the term of office,[1] "unless sooner removed in accordance with the provisions of the law." *State ex inf. Barrett v. Hedrick,* 294 Mo. 21, 241 S.W. 402, 422 (1922). On the other hand, the constitution stands to protect the citizenry from persons who use their position of public trust to appoint their relatives to public office.

The legal theory supporting the use of *quo warranto* to oust a public official for misconduct rests on the notion that misconduct automatically renders the official's title to office a nullity and he or she "becomes a mere interloper." *State ex rel. McKittrick v. Murphy,* 347 Mo. 484, 148 S.W.2d 527, 530 (1941). The cases go so far as to say that an

---

1. It is noted that an official's elected term of office may, under certain circumstances, be cut short, via a change in the term of that office, *Sanders v. Kansas City,* 175 Mo.App. 367, 162 S.W. 663, 665 (1914) (*cited with approval in State* *ex rel. Voss v. Davis,* 418 S.W.2d 163, 169–70 (Mo.1967)), or via the office being eliminated completely, *Davis,* 418 S.W.2d at 169–72, without liability to the official whose term is cut short.

**402**

officer who commits misconduct in office "automatically [loses the] right to the office ... *prior to* the institution of [a *quo warranto* ] proceeding." [Emphasis added.] *State inf. Dalton v. Mosley,* 365 Mo. 711, 286 S.W.2d 721, 731 (1956). Of course, the latter statement is a bit too ambitious. It is true only if the office holder resigns at the horror of discovering the misconduct. For the vast majority of those who lose office by misconduct (assuming the voters do not preside at the ouster on election day), judicial action assuring due process to the office holder is a necessary and appropriate prerequisite to ouster.

The cases also say that judgments of ouster enforcing article VII, section 6, are "self-enforcing." *E.g., State ex inf. McKittrick v. Wymore,* 343 Mo. 98, 119 S.W.2d 941, 945 (1938). The cases seem to mean two different things when they use the phrase "self-enforcing." When they speak of the anti-nepotism provision of the constitution, "self-enforcing" means that the people have put that portion of the constitution

> beyond the power of the legislature to render such provisions nugatory by refusing to pass laws to carry them into effect.... Constitutional provisions are self-[enforcing] when there is a manifest intention that they should go into immediate effect and no ancillary legislation is necessary to ... the enforcement of a duty imposed.

12 C.J. 729, *quoted with approval in State ex inf. Norman v. Ellis,* 325 Mo. 154, 28 S.W.2d 363, 365 (1930). When the cases speak of a judgment of ouster being "self-enforcing," they mean that no further judicial process is required to enforce the judgment of ouster rendered by the court. The phrase "self-executing" is more accurate.

■ That a provision of the constitution is self-enforcing—that is, beyond the reach of the legislature to amend or enforce—does not support a conclusion that judicial enforcement of constitutional due process guarantees or that rights to appellate review established in article V are terminated as well. The necessity of a *quo warranto* to effect ouster is alone sufficient proof that the constitution is not self-enforcing without judicial

action. Rule 98.01 assures that "proceedings *quo warranto* shall be governed by and conform to the rules of civil procedure." Those rules include the right to appeal the lower court's judgment. Likewise, a conclusion that a judgment is "self-executing"—one that "require[s] the aid of no writ, process, or proceedings to make [it] operative," *State ex rel. Gray v. Hennings,* 194 Mo.App. 545, 185 S.W. 1153, 1154 (1916)—does not support a conclusion that rights to meaningful appellate review are terminated as well.

Having determined that judgments of ouster issued by lower courts are subject to appeal, we next consider whether a trial court may issue a stay of a judgment of ouster in a *quo warranto* proceeding. This Court's rules say that "[a]ppeals *shall* stay the execution [of a judgment] ... when the appellant, at or prior to the time of filing notice of appeal, presents to the court for its approval a supersedeas bond which shall have such surety or sureties as the court requires." [Emphasis added.] Rule 81.09(a)(2).

■ We do not believe Rule 81.09 requires a trial court to grant the holder of a public office who appeals from a judgment of ouster a stay as a matter of right. A judgment of ouster is of a special character and is founded on a judicial determination that a public officer has committed acts that render him or her an improper vessel to continue to hold the public trust. It takes precious little creativity to imagine a situation in which a public official's acts are so egregious and so dangerously inimical to the public good that a stay would be inappropriate. We hold, therefore, that because of the special nature of a judgment of ouster of a public officer from office, compliance with Rule 81.09 does not operate to stay the judgment as a matter of right.

■ By concluding that an appellant cannot claim a *right* to a stay of the trial court's judgment of ouster by filing a supersedeas bond pursuant to Rule 81.09, we do not say that a trial court may never stay a judgment of ouster of a public official. The power to issue such a stay emanates from the trial court's inherent power to preserve the *status quo,* not from Rule 81.09. As regards

judgment of ouster, a trial court should issue a stay only under the most unusual circumstances where the appeal presents genuinely debatable, non-frivolous questions of law and there is no danger to the public welfare presented by the continuation in office of the public officer. This power exists in the courts even if the judgment is self-executing. *Banach v. City of Milwaukee*, 31 Wis.2d 320, 143 N.W.2d 13, 18 (1966).

We are aware that the court of appeals reached a contrary result in *State ex rel. Nixon v. Belt*, 873 S.W.2d 644, 647 (Mo.App. 1994). The court of appeals concluded that the trial court's stay could only serve to prevent execution on the court cost judgment. This was because "an appeal bond operates 'as a supersedeas only on the process of execution; it suspends [only] the performance of acts commanded to be done.'" *Id.* (*citing Hennings*, 185 S.W. at 1154–55). The court of appeals reasoned that the ouster judgment required no further affirmative act of Shull beyond payment of court costs and that the supersedeas could not stay a prohibitory judgment. The court said Shull "was not commanded to perform any affirmative act by virtue [of the judgment]. Rather, she was prohibited from further exercise and occupation of the forfeited office." *Id.* at 649. *Hennings* interpreted the meaning of Section 2042, RSMo 1909, the statutory predecessor to Rule 81.09. Insofar as the court of appeals' decision holds that Rule 81.09 does not apply to stay an ouster judgment, it is correct. To the extent that *State ex rel. Nixon v. Belt* stands for the proposition that a trial court can never stay a judgment of ouster of a public official, it is overruled.

There is a way for the Attorney General to avoid issues relating to stays and the delay that necessarily attends appeals of ouster judgments. This Court has original jurisdiction "to issue and determine original remedial writs." Mo. Const. art. V, § 4; Rule 98.01; *State ex inf. Ashcroft v. Alexander*, 673 S.W.2d 36 (Mo. banc 1984); *State ex inf. Danforth v. Orton*, 465 S.W.2d 618 (Mo. banc 1971), *cert. denied*, 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 92 (1971); *State ex inf. Anderson v. St. Louis County*, 421 S.W.2d 249 (Mo. banc 1967); *State ex inf. Eagleton v. Elliott*, 380 S.W.2d 929 (Mo. banc 1964); *State ex inf. Dalton v. Mosley*, 365 Mo. 711, 286 S.W.2d 721 (1956); *State ex inf. Taylor v. Cumpton*, 362 Mo. 199, 240 S.W.2d 877 (1951), *overruled on other grounds by Dalton*, 286 S.W.2d at 733; *State ex inf. McKittrick v. Williams*, 346 Mo. 1003, 144 S.W.2d 98 (1940).

## IV.

The judgment is affirmed.

All concur.