STATE of Missouri, on the Information of Frank D. CONNETT, Jr., Prosecuting Attorney of Buchanan County, Informant,

v.

John MADGET, Presiding Judge of the Buchanan County Court and A. Walter Smith, Jr., Judge from the Second District, Buchanan County, Respondents.

No. 45058.

Supreme Court of Missouri.
En Banc.

Dec. 10, 1956.

Rehearing Denied Jan. 14, 1957.

Frank D. Connett, Jr., Pros. Atty., James H. Horn, St. Joseph, for informant.

Lyman Field, Clay C. Rogers, James W. Benjamin, Rogers, Field, Gentry & Jackson, Kansas City, for respondents, Randolph & Randolph, St. Joseph, of counsel.

STORCKMAN, Judge.

This is an original proceeding in quo warranto brought by Frank D. Connett, Jr., prosecuting attorney of Buchanan County, as informant and directed against respondents John Madget and A. Walter Smith, Jr., judges of the County Court of Buchanan County. The information charges the respondents jointly and severally with the commission of acts of wilful and malicious oppression, partiality, misconduct and abuse of authority in their official capacities and under color of their offices. The prayer is for a declaration that the respondents have forfeited their offices and for ouster.

The action was instituted June 11, 1955, and on September 12, 1955, the Honorable James D. Clemens, judge of the Circuit Court of the Thirty-fifth Judicial Circuit, was appointed special commissioner to hold hearings and report his findings of fact and conclusions of law. Hearings were held and in his report filed March 26, 1956, the special commissioner found that the respondents had committed certain of the acts charged and had thereby forfeited their respective offices, and should be ousted therefrom. The transcript of the proceedings, consisting of 1282 typewritten pages, is well reported and prepared. The record attests that the special commissioner discharged his duties ably and efficiently. There was commendable cooperation by counsel for both parties. The case has been well briefed and orally argued before the court.

The amended information, in addition to a general allegation, charges seven instances or categories of violations. The charges are well summarized in the report of the special commissioner as follows:

"In submitting the case, Informant relied on the following charges of misconduct, which are numbered as in the First Amended Information, and titled by the Commissioner for sake of clarity and reference:

"Par. 5. *The General Charge.* Informant charges that Respondents, as judges of the County Court, have jointly and severally committed acts of willful and malicious oppression, partiality, misconduct and abuse of office, all by the following specific acts:

"Par. 6. *Exclusion of Judge Gilpin Charge.* Informant charges that Respondents have ostracized the third judge of the court, Judge Don Gilpin, and conducted county business at irregular times and in such manner as to prevent Judge Gilpin from participating in the county's business.

"Par. 7. *Purchase of Girls' Home Charge.* Informant charges that Respondents, knowing that the Judge of the juvenile Court of Buchanan County had recommended the purchase of a rural home, rather than urban property, for a home for juvenile girls, nonetheless purchased a house within the city of St. Joseph; that Respondents caused the County to pay $14,-500 therefor, although the market value was $8,000, for which sum the property

had been sold to the County's grantor only one week earlier.

"Par. 8. *The Players Night Club Charge.* Informant charged that Respondent A. Walter Smith, Jr. operated a night club and had five employees there, whom Respondents placed on the county payroll; that the employees were assigned working hours so as not to interfere with their employment at the night club but so as to result in inefficiency and inconvenience to other County employees; that Respondent A. Walter Smith, Jr., gained indirect financial benefit thereby.

"Par. 9. *The Lowest and Best Bidder Charge.* Informant charges that Respondents failed to afford due opportunity for competitive bidding on purchases of supplies, and exercised personal favoritism in awarding contracts to persons other than the lowest and best bidders. The specific items were: (a) A motor grader (b) A vacuum cleaning machine (c) A scrubbing machine (d) Crushed road rock (e) Two Nash station wagons.

"Par. 10. *The Boycott Charge.* Informant charges that Respondents ordered other county officials to refrain from making purchases from certain business firms and threatened to withhold payment if such purchases were made. The specific firms involved were: (a) Louis Marek (b) Reagan-Whitaker Insurance Agency (c) Hillyard Chemical Company (d) Woodbury Chemical Company (e) St. Joseph Chemical & Brush Company (f) Mannschreck Book Store.

"Par. 11. *The Bond Premium Charge.* Informant charges that the Buchanan County Collector had negotiated with two local agents for his official bond, but that Respondents declined to approve such bond unless a third local agent, Leo Roseler, received one-third of the agents' commission.

"Par. 12. *The Defense Fund Charge.* Informant charges that after the filing of the original Information herein, the Respondents coerced county employees to pay money into a fund to be used to pay Respondents' counsel for defending this action."

For present purposes the facts are sufficiently stated in the special commissioner's finding of fact as follows:

"The Commissioner recommends adoption by the Court of these findings of fact:

"The Respondents.

"Respondents John Madget and A. Walter Smith, Jr., were elected as Presiding Judge and Associate Judge, respectively, of the County Court of Buchanan County, and took office January 1, 1955. Both were Democrats and neither had held such office before.

"Respondent Madget was 43 years old. He had previously held public office as Representative in the Missouri General Assembly and as Public Administrator of Buchanan County. He is mature and intelligent.

"Respondent Smith was 41 years old. He had experience in business and at all times involved here he operated the Players Night Club in St. Joseph. Respondent Smith is keenly intelligent and vigorous.

"Buchanan County and The County Court.

"Buchanan County is a County of the Second Class with a population of over 90 thousand. The County Court consists of a Presiding Judge and two associate judges. The other member of the Court is Associate Judge Don Gilpin, a Republican, who has held such office since January 1, 1953.

"Prior to January 1, 1955, the County Court was composed of two members of the Republican Party and one of the Democratic Party. On that date, Respondent Madget succeeded a Republican, Respondent Smith succeeded another Democrat and Judge Gilpin succeeded himself. Thus, upon the election of Respondents, the Court changed from Republican to Democratic 'control'. Employees of the highway de-

partment, the county health unit, engineering department and courthouse janitors, eighty-some in all, are appointed by the county court. By tacit understanding over many years these employees serve for two-year terms, and at the end of each term the employees tender their resignations. January 1, 1955, saw a 'change in political complexion' of Buchanan County, so the old employees resigned and new employees were appointed by Respondents. Not only the appointment of employees, but the awarding of court business, was not without a partisan tinge. Andrew Jackson's credo 'to the victor belong the spoils' was not without its advocates in Buchanan County. In past administrations, when one of the county judges belonged to a political party different from the other two judges, the 'party line' was often followed, even to the extent of the 'minority judge' not joining the 'majority judges' in signing court records and official documents. The inevitable result of such a schism is to deprive some of the people of representation, but such a situation is not, of course, peculiar to Buchanan County. Such was the climate in which Respondents found themselves at the beginning of their term, more realistic than idealistic.

"The Exclusion of Judge Gilpin Charge.

"Prior to January 1, 1955, the 'regular hours' of sessions of the County Court were from 10 A.M. to 4 P.M., with a recess for lunch, and these hours seemed to continue in force. From the outset, Judge Gilpin was not taken into full confidence by Respondents. The County Court records and purchase orders were generally signed only by Respondents. (Some of these forms had places for only two signatures.) The Respondents failed to seek the counsel of Judge Gilpin on all county business, and Judge Gilpin did not press the matter. Soon, Judge Gilpin began attending sessions tardily, and rarely attended afternoon sessions. Previously, bids were received at 4 P.M., and laid over until the next day, but Respondents opened bids and acted upon them when received. Judge Gilpin was rarely present at such times, although the 'dead-line' for bids was, of course, known to Judge Gilpin as a matter of public knowledge.

"There was no evidence that Respondents conducted county business at irregular times.

"From the outset, Judge Gilpin realized that he could not control the action of the County Court in the face of united opposition, and he accepted the situation. Respondents did not act in the best public interest by not encouraging Judge Gilpin's participation, nor did he by petulantly declining to be present to represent his constituents. Judge Gilpin was not so much a pariah as he was a recluse.

"The Purchase of the Girls' Home Charge.

"Prior to 1955, juvenile delinquent girls were detained in a 5-room house at the outskirts of St. Joseph. The home was in poor repair, vermin infested, and subject to overflow from sewage facilities. Early in January, Respondents conferred with the 3 Circuit Judges of Buchanan County about the home, and they inspected it. The consensus of opinion was that it could not be repaired and that another home should be purchased and remodeled. The Circuit Judges expressed to Respondents the advantages of a rural rather than an urban home, large enough to house 8 to 10 people. Later in January, the County Court budgeted $20,000 for acquisition and repair of another home. In mid-January Respondents told the Circuit Judges of 3 prospective homes for sale. One was inspected, known as the 'Fuelling Home', located in mid-town St. Joseph. The other two were specifically rejected for various reasons. The parties conferred after the inspection, and the three Circuit Judges repeated their preference for a rural home, so that the inmates could have space for gardening, etc. None had any specific knowledge of available property, and the conference broke off with the understanding that all would 'keep look-

ing'. The search bore no fruit. A flood aggravated the condition in the existing girls' home, and on February 20, 1955, Respondents next met with the three Circuit Judges and announced that they had just signed a contract to buy the Fuelling Home.

"The Fuelling Home was an old brick house, with eleven rooms and 3 baths, located on a normal sized city lot. It was structurally sound, but badly in need of many minor repairs. It was 'too much house' and poorly located for the desired use.

"The Fuelling Home was called to Respondents' attention by one J. L. Hager, a real estate agent previously unknown by Respondents. One Stambaugh had bought the Fuelling Home in 1953 for $6500; he had rented furnished apartments therein for a total of $215 per month. Hager, learning of the county's need for a girls' home contracted for purchase of the Fuelling Home from Stambaugh for $8,075. Hager caused $13.20 in revenue stamps to be placed on the deed, indicating a consideration of $12,000. Hager then sought out Respondent Smith and offered the Fuelling Home for sale at $15,000. (It was at this stage that Respondents and the three Circuit Judges had inspected the property.) Within a week after concluding his purchase from Stambaugh for $8,075, Hager and Buchanan County contracted for resale at $14,500. No prior appraisal was made, or sought, by Respondents. There was no indication that Respondents knew of the amount of Hager's quick $6,425 profit, nor that they personally profited by the transaction. In view of two sales of the property within the preceding two years, and the Respondents' failure to have the property appraised, it must be said that Respondents paid far in excess of the reasonable market value of the property. The Respondents did not display sound common sense in spending public funds. Because of Respondents' utter lack of business acumen, Buchanan County was overreached to the extent of over $6,000.

"The Respondents, with only weeks of experience in their new office, acted precipitously and recklessly in buying the Fuelling Home in the face of the advice of the three experienced Circuit Judges. True, there was an emergency, and the Circuit Judges had recommended no specific property, but the purchase of the Fuelling Home was not a sound solution to the problem.

"The Players Night Club Charge.

"Respondent Smith operated the Players Night Club. He employed a bartender, a waitress, a porter and three musicians. Early in 1955 Respondents employed 5 of these 6 persons to work for Buchanan County: the waitress as a typist, the porter as a 'grease man' at the county garage, and the musicians as janitors at the courthouse. Seasonal factors had caused a lull at the night club after the first of the year, and the 5 persons were faced with dicharge or having their working hours reduced. But, none left his employment at the night club after becoming employed by the county. Each received lower wages for the night club employment after going to work for the county, but such reduction was proportionate to the reduced hours of employment at the night club. The only benefit Respondent Smith received from this arrangement was that of not having his night club employees leaving his business for more lucrative employment. There was no indication that Respondent Smith received any service from these five employees other than that for which he personally paid them.

"The hours of the janitors and the 'grease man' were generally from 11 A.M. to 7 P.M., five days a week. These hours did not interfere with their work at the night club. The Informant charged that these hours resulted in inconvenience to other officers of Buchanan County, but no office occupant so testified. The only evidence of this was from Wade Thuston, the head janitor, who said that some of the office occupants in the courthouse objected to the janitors coming in during office

hours, which seem generally to have been from 9 A.M. to 4 P.M. However, the janitors' hours do not seem to have been unprecedented, and some of the work could be done only during office hours, and the janitors worked three hours after most offices closed. The 'grease man' had to do most of his work after the vehicles returned to the garage at the end of the day, so his hours from noon to 8 P.M. do not seem unusual. The typist worked normal hours and received normal pay from the county.

"It is doubtful that Buchanan County received a full measure of efficient service from these employees who were 'doubling up' on jobs. But there is no substantial evidence of benefit to Respondent Smith nor of undue inconvenience to the officers of Buchanan County.

"The Lowest and Best Bidder Charge.

"The Grader: Pursuant to call for bids, the county received three bids for a new road grader, each bidder also bidding to take the county's old dozer in trade. Respondents accepted the bid of Cooke Sales and Service Company for an Allis-Chalmers grader at $14,551.35, less $1,000 for the county's dozer, for a net price of $13,-551.35. The Service Equipment Company bid an Adams grader at $14,788, less $1750 for the old dozer, for a net price of $13,038. The Buchanan Equipment Company bid an Austin-Western grader at $15,744, less $6,-745 for the old dozer, for a net price of $8,-999. The amount of these bids for the trade-in of the county's old dozer have little relation to its real value, and it was only the net prices which were of real concern to the county. Admittedly, the Adams grader was not as efficient for the county's purposes as was the Allis-Chalmers. The relative merits of the Allis-Chalmers and the Austin-Western machines were closer. The Austin-Western dealer verbally withdrew his bid the same day it had been made in writing. His agency was not in sound financial condition, and had its nearest service facilities at Kansas City, while the Allis-

Chalmers agency was a sound local concern and had service facilities at St. Joseph. The evidence showed that Respondents did not accept the lowest bid, but there is no clear showing that they did not accept the 'best' bid.

"The Vacuum and Scrubbing Machines: In February, 1955, the County Court advertised for bids on each of these machines. Five bids were received on each, and several days later the court accepted the bids of the Western Chemical Company for $363.60 and $454.00, respectively. The rejected bids were substantially from $100 to $200 lower on each machine. After the call for bids was received, only the Western Chemical Company had a representative call on Respondents and on Wade Thuston, the head janitor, to whom the machine was demonstrated. Thuston told Respondents that he had previously used Western's machines, that their service facilities were best, that the machines differed in quality, and that he preferred to have Western's machines. Respondents followed Thuston's advice and accepted the higher bids on the strength thereof. The bids accepted were not the lowest but the products were thought by Respondents to be the best.

"The Crushed Rock: In February, 1955, the County Court advertised for bids on 50,-000 tons of crushed rock for road use to be 'stockpiled in Buchanan County'. Three bids were received. The Whitman Company bid $1.37-1/2 per ton, which was accepted. The Everett Quarries and Lee Stafford each bid $1.40 and were rejected. The bids were identical in terms except as to price. Informant adduced evidence tending to show that Respondents did not accept the 'best' bid because the location of the Whitman quarry was such that hauling therefrom would be more expensive than hauling from the County's choice of the Everett and Stafford quarries. Everett and Stafford testified that such practice had been followed, but their bids did not provide for such choice. The 'lowest' and the 'best' bid was accepted.

"The Nash Station Wagons: On February 10, 1955, the Buchanan County Court advertised for bids for two station wagons, the bidder to accept a 1950 station wagon in trade. The following net bids were received: Studebaker $4200, Nash $3636, Chevrolet $3602, Ford $3350, GMC $3343, and Plymouth $3125. The Nash bid was accepted. Exclusive of the Studebaker, the reasonable market value of the two Nash station wagons was from $200 to $500 lower than the other makes, yet the bid accepted was from $34 to $511 higher than the others. The Respondents considered these differences in price, and selected the Nash bid because they said they believed a lighter car was adequate for the intended use, and that because of its lower gasoline consumption the County would save up to $150 per car per year. The Respondents' judgment may be questioned but there is no substantial evidence that they failed to accept the 'lowest and best' bid.

"Informant sought to fortify this charge by attempting to show that Respondent Madget had, before taking office, offered 'county business' to a firm if they would make him a 'good deal' on the sale of a personal automobile. There was such testimony but it was flimsy. Informant further sought to show that Respondent Madget had, soon after awarding the Nash contract, personally purchased a Nash automobile from the successful bidder at an unreasonably low price. The amounts, insofar as they were comparable, did so indicate, but Informant's own witness testified that the price was not low. These are only innuendoes; they fail to show personal gain to Respondent Madget, and do not support the charge of failing to accept the best and lowest bid on the station wagons.

"The Unintelligible Specifications. Informant argues that Respondents failed to publish intelligent specifications regarding the call for bids for the grader and the vacuum and polishing machines. Section 50.660 V.A.M.S. does not require that 'specifications' be published, or even prepared. The call for bids on these items was in language that Respondents and bidders could understand, and there was no indication that Respondents intended to confuse bidders, or that Buchanan County suffered financially therefrom.

"The Boycott Charge and the Bond Premium Charge.

"The Buchanan County Sheriff, C. A. Jenkins, was keeper of the jail and fed the prisoners. The groceries were bought on a rotation basis from some 30 grocers, including one Louis Marek, who had been a political opponent of Respondent Smith. The bills were presented monthly to the County Court for payment. In mid-January, 1955, Respondent Smith sent for Sheriff Jenkins. When the Sheriff arrived at the courtroom, Respondent Smith showed the Sheriff the bill from Marek and told him 'he didn't want to buy any more groceries from that son-of-a-bitch'. The Sheriff remonstrated, but Respondent Madget affirmed the position taken by Respondent Smith. The Sheriff bought no more groceries from Marek.

"About the first of February, 1955, an insurance broker, L. D. Nash, went to the County Court to deliver two fire insurance policies in renewal of other insurance about to expire. The new policies were written through the Reagan-Whitaker Insurance Agency, and bore an emblem so stating. Nash presented the policies to Respondent Smith, who looked at them and then told Nash that 'we' aren't accepting any policies from that agency. Nash offered to place the business through another agency, but Respondent Smith declined, adding that the business had already been placed.

"The Buchanan County Purchasing Agent, Harry Bealls, was told by Respondents not to make purchases from the St. Joseph Chemical Company. Upon Respondents' election in November, 1954, one of the salesmen for this company had been

openly critical of the Respondents personally and had publicly said that they were a couple of crooks. Respondents also directed Bealls not to order any supplies from the Woodbury or Hillyard Chemical Companies 'unless you have to'. The Woodbury Company, so Wade Thuston, the head janitor had told Respondents, had sold faulty materials and declined to replace them.

"The Bond Premium.

"Buchanan County Collector Clifton Hurst had been re-elected for a term beginning March 1, 1955. He had been under a $496,000 joint bond written by two surety companies represented by the Whitaker and Robinson Agencies. He had arranged for a renewal of this bond, but had not yet presented it to the Buchanan County Court for formal approval. In February, 1955, he had been approached by another local agent, Leo Roseler, who unsuccessfully sought this bonding business. Later, Respondents, accompanied by Roseler, came to Hurst's office asking that Hurst let Roseler 'write a portion of the bond'. Hurst declined, saying that it was already written, and any change would have to be made through the two agencies. Respondent Madget dropped the matter there, but Respondent Smith repeated the request later on. Hurst's answer was the same. Respondent Smith later phoned Kenneth Robinson, one of the bonding agents, and told him that unless Leo Roseler participated in the bond in some manner, it would not be approved. No change was made in the corporate sureties to include a company represented by Roseler, but subsequently each agency paid Leo Roseler a third of their commission, and the original bond was approved.

"There was a deliberate effort on the part of Respondent Smith to favor certain persons in participating in county business, and a corresponding deliberate attempt to boycott other persons. Respondent Madget was less deliberate in such action, but by his conduct he abetted the high degree of deliberation apparent in the conduct of Respondent Smith.

"The Defense Fund Charge.

"For some years there had existed among those Buchanan County employees who were appointed by the County Court, what some called a 'lug' and others more euphemistically called the 'flower fund'. To this fund these employees made monthly payments. At the times now concerned the rate was 2½%. On pay days the employees would come into the office of the County Engineer, endorse their checks, cash them, and leave the 'donation' with an employee. This was an 'automatic' deduction, knowingly accepted by all employees, though grudgingly by some. Some of the money was, in fact, used for charitable purposes but most of it for political purposes, to keep the incumbent county judges in office—at least the judges who belonged to the 'right' political party. This 'flower fund' at the times herein concerned was collected under the supervision of the County Engineer. It was not deposited in a bank account, but the County Engineer made reports at times to the county court judges interested therein.

"After Respondents took office, they appointed as County Engineer one George Gammon, a friend of long standing of Respondent Smith. (Mr. Gammon's professional qualifications are unquestioned). Gammon's duties placed him in a supervisory position over other supervisory personnel of the highway department, including Bennie Stanton, the Assistant County Engineer, who operated the garage and supervised the foremen, including Simon Adkins. The foremen, in turn, supervised the maintenance men of the highway department.

"This action was instituted early in June, 1955. About mid-June Respondents' attention was publicly called to a plan for county employees to participate in a 'defense fund' to pay Respondents' attorneys. The plan was designed to cover payments by employees who had been appointed by Respondents, in the highway, purchasing, janitor and health departments.

"About mid-June, Gammon discussed the matter with the foremen of the highway department, and they in turn discussed it with the maintenance men. The first payments were to be made on the June 30th pay day. The words 'voluntary' and 'contribution' were used often in these discussions. Lists of the names of the highway department employees had been prepared by Gammon, with blank spaces for the amounts of their payments to be filled in by the employees. These lists were circulated among the employees by supervisory personnel. Gammon had told the foremen that the 'minimum contribution' should be $25. The statements by supervisory personnel to the maintenance men were such that some, at least, reasonably understood they would lose their jobs if they did not pay. Gammon announced prior to the June 30th pay day that the customary payment to the 'flower fund' would not be received that month, and when pay day arrived he declined to accept at least two proffers by employees who declined to pay more than that.

"Three of the highway maintenance men, Morris, Crockett, and Boyer, announced to Gammon and Stanton that they would not pay to the 'defense fund', and they did not pay at the June 30th pay day. A few days before the end-of-July pay day there appeared on the employees' bulletin board at the highway department garage a poster so arranging words and pictures as to read, in substance: 'Put your heart in the County Court, or get your ass out'. Morris, Crockett and Boyer took offense at this sign, and related the matter to newspaper reporter Norman Steward, who wrote a news story about it. Morris, Crockett and Boyer were ordered by Gammon to report to his office, where they found Respondents waiting to see them with a copy of the news story in hand. Respondents questioned the three men's conduct in telling the paper about the sign, and the men countered by challenging Respondents' rights to do so. Respondent Smith announced: 'As far as I'm concerned you're fired'. Respondent Madget nodded in assent. The three employees promptly drew their pay, and quit. Gammon and Stanton knew of the sign having been posted. Respondent Smith knew of it through the newspaper story. None took action to correct the implication it reasonably raised: that the employees should pay or quit. Respondent Smith so understood the sign and saw nothing objectionable in its use.

"Another employee who declined to pay to the defense fund at the June 30th pay day was a highway maintenance man, Arthur Barton. He had offered instead to pay his customary 2½% to the 'flower fund', but Gammon declined to accept it, and told Barton he'd have to see 'Johnny' Madget about it, which Barton did not do. Barton, a part-time farmer, had asked, in lieu of vacation, for a few days off to do some harvesting, and Bennie Stanton had told him he could do so. On July 10th, Barton sent word to Stanton that he was 'taking off' the following day. Stanton apparently did not get this message, and on July 11th learned that Barton was not at work. Stanton, accompanied by Gammon, drove to the Barton farm and 'fired' him for his claimed truancy.

"Toward the end of June, County Engineer Gammon went to the County Purchasing Agent Harry Bealls and told him about the 'defense fund'. Gammon gave Bealls lists of names of the janitors and another including the name of Dr. Spenser of the County Health Unit. Gammon told Bealls that the minimum payment should be $25.00, and that it was most important. Later, in Gammon's office, with Respondent Madget present, Gammon asked Bealls about his progress on the list. Bealls reported that Dr. Spenser had offered to give $5.00 and Gammon said that wouldn't do. Respondent Madget said nothing. Bealls then told Gammon that the janitors wanted to divide their $25 into two separate payments, to which Gammon replied that there would be no split, and Respondent Madget added the statement that he'd have Respondent Smith 'see the janitors.'

"Proceeds of the solicitation amounted to $3200, and was put into a joint account by Gammon and Stanton.

"Respondents knew of the plan in mid-June. Respondent Madget stated to the newspaper that the payments were to be 'voluntary', and both Respondents say they told Gammon the same. Nothing more was said by Respondents, and they made no inquiries. In view of Respondents' knowledge of Gammon's modus operandi, their summary discharge of uncooperative employees, and their eagerness to participate in the proceeds, it can only reasonably be found that Respondents, under color of their office, coerced county employees to contribute money to Respondents for their own personal use and benefit."

The conclusions of law found by the special commissioner are as follows:

"Conclusions of Law as to the Exclusion of Judge Gilpin Charge.

"The Respondents have not committed any act of willful ·or malicious oppression, misconduct or abuse of authority in connection with the Exclusion of Judge Gilpin Charge.

"Conclusions of Law as to the Purchase of the Girls' Home Charge.

"1. It was the duty of the Respondents as judges of the County Court, rather than the duty of the three Circuit Judges as members of the parole board, to provide a place of detention for juveniles, and Respondents did not abuse their authority in purchasing the Fuelling Home.

"2. Respondents' conduct in the purchase of the Fuelling Home in excess of its market value, even though reckless and extravagant, was not a malicious abuse of their authority.

"Conclusion of Law as to the Players Night Club Charge.

"The conduct of Respondents, in appointing employees of Respondent Smith as county employees, without substantial ben-efit to Respondent Smith and without substantial detriment to Buchanan County, did not constitute acts of willful and malicious partiality or abuse of authority.

"Conclusions of Law as to the Lowest and Best Bidder Charge.

"1. Although Respondents may have exercised poor judgment in accepting bids, their conduct was within the bounds of the discretion vested in them, and their conduct did not constitute partiality or abuse of authority.

"2. Respondents were not required by law to prepare or publish detailed specifications, and their failure to do so did not constitute abuse of their authority.

"Conclusions of Law as to the Boycott and the Bond Premium Charges.

"1. As judges of the County Court of Buchanan County, Respondents occupied a position of trust toward Buchanan County. In the management of the County's business, they were not acting as individuals, but as public servants and trustees for their constituents.

"2. The Respondents' conduct was contrary to this principle. By conducting county business in a manner to satisfy their personal animosity and bias, and by using their official positions to influence the actions of other county officers so as to satisfy their own personal likes and dislikes, the Respondents ·have committed acts of willful and malicious oppression, partiality and abuse of authority under color of their offices, as charged by Paragraphs 10 and 11 of the First Amended Information.

"3. Respondents' conduct violated the provisions of Section 558.110 R.S.Mo.1949 [V.A.M.S.], and each Respondent thereby forfeited his office.

"Conclusions of Law as to the Defense Fund Charges.

"1. Respondents' conduct in knowingly permitting, encouraging and promoting the solicitation and collection of money from

county employees, who had been appointed and were subject to discharge by Respondents, for the personal use and benefit of Respondents in paying attorney fees were acts of severity and unlawful exaction, and tended to deprive such employees of their property against their will; such acts were oppressive.

"2. Respondents' conduct, as aforesaid, constituted willful and malicious oppression, misconduct and abuse of authority under color of their respective offices, as charged by Paragraph 12 of the First Amended Information.

"3. Respondents' conduct violated the provisions of Section 558.110 R.S.Mo.1949 [V.A.M.S.], and each Respondent thereby forfeited his office."

The special commissioner's recommendations and conclusions of law as to the final judgment are:

"1. By Respondents' conduct each has committed acts of willful and malicious misconduct in office, has thereby forfeited his office, and should therefore be ousted.

"2. Three-fourths of the cost herein having been incurred in connection with charges of which Respondents should be absolved, Respondents should be taxed with one-fourth of the costs."

The informant contends that the special commissioner should have found against the respondents on all charges of the amended information. On the other hand, the respondents support the findings to the extent that they are favorable to them and contend that the special commissioner erred in finding against them with respect to the charges made in Paragraphs 10, 11 and 12 of the amended information.

The informant relies upon alleged violations of § 558.110 RSMo 1949, V.A.M.S., for the basis of his action. This section provides: "Every person exercising or holding any office of public trust who shall be guilty of willful and malicious oppression, partiality, misconduct or abuse of authority in his official capacity or under color of his office, shall, on conviction, be deemed guilty of a misdemeanor." Section 106.220 provides, inter alia, that any person elected to a county office "who shall be guilty of any willful or fraudulent violation or neglect of any official duty, * * * shall thereby forfeit his office * * *."

The parties agree that a proceeding in quo warranto to declare a forfeiture of public office and for ouster of the usurper is civil in nature. See State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W.2d 941, 947 [12], 119 A.L.R. 710. However, the respondents contend that "the burden nevertheless remains upon the informant to not only show guilt on respondents beyond a reasonable doubt * * *, but also to overcome the great reluctance of courts to apply the drastic remedy of removal of a public officer from office."

■ We accept the proposition that in this type of quo warranto proceeding the burden of proof is upon the informant to prove that the respondents, by the commission of acts alleged, have forfeited their respective offices. State ex inf. Taylor v. Cumpton, 362 Mo. 199, 240 S.W.2d 877, 883 [6].

■ The respondents have cited a number of criminal cases in support of their contention that such proof should be beyond a reasonable doubt. These cases are not controlling, however, because the quantum of proof is not the same in a quo warranto case. The applicable rule is stated in Prentiss v. Illinois Life Ins. Co., Mo., 225 S.W. 695, 701: "In civil cases, even where the cause of action or defense is based upon a criminal charge a preponderance of the evidence is sufficient, although the evidence is all circumstantial. It need not be proved beyond a reasonable doubt, or what is the same thing, exclude every other reasonable hypothesis. State ex rel. [Detroit Fire & Marine Ins. Co.] v. Ellison, 268 Mo. 239, 187 S.W. 23; Edwards v. [George] Knapp

& Co., 97 Mo. 432, 10 S.W. 54; Smith v. Burrus, 106 Mo. [94] 101, 16 S.W. 881, 13 L.R.A. 59, 27 Am.St.Rep. 329; Marshall v. [Thames Fire] Ins. Co., 43 Mo. 586." See also 32 C.J.S., Evidence, § 1020, p. 1050.

In 74 C.J.S., Quo Warranto, § 43, p. 257, the general rule as to weight and sufficiency of evidence in this specific kind of proceeding is stated as follows: "In most jurisdictions, the rules governing the weight and sufficiency of evidence in civil actions generally * * * have been applied in quo warranto proceedings to test right or title to office * * *."

■ However, forfeitures are not favored and the foregoing legal principles are tempered by the rule stated in 43 Am.Jur., Public Officers, § 34, p. 39: "The remedy by the removal of a public officer has been said to be a drastic one, and the statutory provision defining the grounds for removal is given a strict construction."

In discussing the case of State v. Boyd, 196 Mo. 52, 94 S.W. 536, cited by the informant, respondents' counsel notes that the case "referred to Section 7, Article XIV of the Constitution which provides that the General Assembly shall, in addition to other penalties, provide for the removal from office of county, city and township officers *on conviction* of wilful, corrupt or fraudulent violation or neglect of official duties." However, this citation was to the 1875 Constitution; the same provision is not in the 1945 Constitution. Art. VII, § 4, of the present constitution, V.A.M.S., simply provides that public officers shall be subject to removal in the manner and for the causes provided by law. Because of this change the Boyd case is not controlling on the point stressed by the respondents.

■ The special commissioner found in favor of the respondents with respect to the charges contained in Paragraphs 6, 7, 8 and 9 of the amended information and we think properly so: The conclusions of the commissioner as to these charges are supported by the record and are in accordance with applicable legal principles.

In claiming that the commissioner erred in his conclusions of law as to these charges, and particularly The Players Night Club Charge, the informant cites Buder v. Fiske, 8 Cir., 174 F.2d 260, 282, and Butler County v. Campbell, 353 Mo. 413, 182 S.W.2d 589, 591. He contends that the respondent county judges, as officers holding positions of public trust, are bound by the same measures of good faith as required of an ordinary trustee toward the beneficiary of the trust. However, the Buder case was an action to surcharge the account of the trustee of an inter vivos trust. The Campbell case was an action to cancel a deed conveying county land on the ground of fraud. Neither case involved a declaration of forfeiture of title to a public office. The instant case proceeds upon statutory grounds and our attention has not been called to any common law authority creating forfeiture on the basis for which the informant now contends. As stated in State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W.2d 941, 943, 119 A.L.R. 710: "The courts are without authority to create and declare a forfeiture of office. Absent forfeiture at common law, the forfeiture can be created and declared only by either the constitution or valid legislative enactments." The information is predicated upon § 558.110 and we must look to the provisions of that statute for the standards by which the acts of the respondents are to be adjudged.

Informant further contends that the special commissioner erred in his conclusion of law that respondents were not required by law to publish detailed specifications in connection with requests for bids for county purchases, citing § 50.660 of our statutes and the cases of Wester v. Belote, 103 Fla. 976, 138 So. 721, and Fones Brothers Hardware Co. v. Erb, 54 Ark. 645, 17 S.W. 7, 13 L.R.A. 353.

■ Section 50.660 provides that all contracts and purchases shall be let to the low-

est and best bidder after due opportunity for competition, including advertising. The statute does not expressly require the formulation and publication of detailed specifications. We are not persuaded by the cases cited that such a requirement should be implied in connection with the statutory provision for competitive bidding where the purpose is to work a forfeiture of public office.

■ We are unable to agree with the special commissioner's conclusions as to the charges in Paragraph 10, The Boycott Charge. So far as appears from the record, the fire insurance coverage had been completed when the broker, L. D. Nash, attempted to deliver renewal policies. The statement that "we" aren't accepting any policies from that agency was apparently gratuitous and inconclusive. The testimony of Sheriff C. A. Jenkins falls short of establishing wilful and malicious oppression or misconduct with reference to purchase of groceries from Louis Marek. The requisition presented was approved and it is too speculative to say that future ones would not have received the same treatment. The same can be said for the testimony that the respondents directed the county purchasing agent, Harry Bealls, an appointee of the respondents, not to make purchases from certain other suppliers. The directive was qualified in at least two instances by the added words "unless you have to" or "couldn't get it from some other source." There were other mitigating circumstances shown by the record which need not be detailed here. It is sufficient to say that no actual refusal to approve purchases or delay in so doing was shown to have occurred because of respondents' expressed dislike or hatred of any supplier.

We have determined that the special commissioner's findings and conclusions as to the charges in Paragraph 11, The Bond Premium Charge, and Paragraph 12, The Defense Fund Charge, are in accordance with the facts and the law and should be sustained.

What insurance agent or broker placed the official bond of the county collector and received the commission was no proper concern of the respondents. Section 52.020 requires that the county collector "shall give bond and security to the state, to the satisfaction of the county courts." Section 52.-380 deals with the amount. Section 107.-070 provides that when any county officer shall be required by law to enter into an official bond he may elect, "with the consent and approval of the governing body" of the county, to furnish a surety bond. It follows that the only legitimate official interest the respondents had in the county collector's bond was with respect to the amount thereof and the sufficiency of the sureties.

■ The salient facts of the bond premium episode are well stated in the special commissioner's findings of fact which we approve. Our examination of the transcript convinces us that these charges are well supported and established by the evidence in the case.

Leo Roseler's connection with the respondents and the motive behind the transaction under scrutiny are disclosed in the testimony of Respondent Smith as follows: "Well, Leo Roseler had worked for me. I made a house-to-house campaign in this primary election and Leo Roseler went out in the neighborhood where I was campaigning and he knocked on doors and recommended me as being a good fellow for the office and when he asked me to recommend him, I felt that I should, so I went in and talked with Cliff Hurst." Respondent Smith conceded that he was trying to influence the county collector to give Roseler a part of the bond, but he did not think it was undue influence. When asked if he said anything to Mr. Robinson, the broker, about approving the bond, Respondent Smith stated, "I did not state so in that language. If he inferred that, that was his inference," and when pressed further about the same matter he testified, "I can't recall the language in the conversation." He testified that he was trying to influence Mr. Robinson to give

Mr. Roseler some of the bond. Respondent Madget in his testimony conceded that he went with Respondent Smith and Leo Roseler to see Collector Hurst. He testified, "I did give him [Hurst] my word that whatever he wanted to do that I would stay with him, but, as a favor, if he could see fit to give Mr. Roseler one-third of it, *we* would appreciate it." The fact that the respondents went together to see Collector Hurst is significant. They were a majority and in control of the county court.

In informant's case Kenneth Robinson, the broker, unequivocally testified that Respondent Smith informed him that "unless Pete Roseler would participate in some acceptable manner in the bond that he, Judge Smith, would not approve the bond." However, the witness further testified that the respondent did not question the sufficiency of the bond or the corporate surety. Collector Hurst testified that his bond was approved by the county court "after a delay." It is an admitted fact that Leo Roseler was paid by the brokers one-third of the agent's commission and that Roseler did not furnish any of the coverage or perform any service in connection with the bond. Evidently the respondents found this manner of participation acceptable. Their conduct in this regard was more aggravated and reprehensible than the solicitation of a reward in the Mosley case, State ex inf. Dalton v. Mosley, Mo., 286 S.W.2d 721, 732.

The conclusion is inescapable that the respondents deliberately embarked upon a course of action calculated to secure a portion of the bond commission for Roseler regardless of the fact that neither they nor Roseler had any valid claim to it. Their persistency in the face of repeated refusals establishes that they were not merely asking a "favor" of a fellow office holder, but that they were using oppression and abusing their authority in their official capacity and that they did so deliberately, wilfully and maliciously. This was not a mere idle threat, but a completed transaction violative of the provisions of § 558.110.

We also accept the special commissioner's findings of fact with respect to the defense fund charge which are set out above. These findings are adequately supported by the evidence in the case. There can be no doubt that the employees were given to understand that their contributing to the defense fund was a condition of their continued employment. It was in the nature of a "kick-back," a forced return of part of one's wages. Boehm v. United States, 8 Cir., 123 F.2d 791, 813 [31].

The respondents contend that they did not know about the proposed fund in the initial stages of its collection. The supervisory employees in charge testified that they wanted to keep it from the respondents. Just why is not explained, but it is apparent that the respondents would have to know about it sometime. But even if they did not know of the fund in its initial stages or the methods employed for its collection, they did learn about it while the job of collecting was still in progress. They took no direct or effective action to relieve the oppressive and coercive methods employed after they admittedly became acquainted with the transaction in all its aspects. In fact, the evidence is that they, especially Madget, participated and took an active part in directing the campaign. By so doing they lent the power and prestige of their offices to the methods employed and they accepted the use and benefit of the fund so raised. The posting of the threatening sign and the discharge of noncontributing employees are admitted facts which together with other evidence refute respondents' claim that the contributions to the fund were purely voluntary.

Respondents contend that the three employees, Boyer, Crockett and Morris, were not discharged until "27 days after the defense fund had been collected." The employment of Arthur Barton was terminated July 11. The record shows that the collection of the fund was commenced about July 1, 1955, out of the June pay, but it does not show when the collection of the fund

was completed. The record does show that the objectionable sign was on display July 25 or 26 and there is other evidence that the collection campaign was still in progress. However, the discharge of the employees is not the wrongful act, but merely evidentiary of the oppressive and coercive methods used in the collection of the fund. The methods used engendered bitterness and ill feeling which culminated in the discharge of four of the employees.

We agree with the special commissioner's conclusions of law with respect to the defense fund charge. The acts of the respondents were in violation of the provisions of § 558.110.

The offenses specifically dealt with in § 558.110 are wilful and fraudulent violations of official duty within the purview and meaning of § 106.220. Therefore, having violated § 558.110 as charged in Paragraphs 11 and 12 of the amended information, the respondents have incurred the forfeiture created by § 106.220 and they should be ousted as recommended by the special commissioner. State ex inf. Dalton v. Mosley, Mo., 286 S.W.2d 721, 732 [4]; State ex inf. Saunders v. Burgess, 364 Mo. 548, 264 S.W. 2d 339; State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W.2d 941, 119 A.L. R. 710.

■ The special commissioner assessed three-fourths of the costs against the informant and one-fourth against the respondents. In spite of the fact that we have also found in favor of the respondents as to the charges in Paragraph 10, we feel that the assessment of costs, as made by the commissioner, is still proper. State ex inf. Dalton v. Mosley, supra.

It is ordered that the respondents be and hereby are ousted from their offices as county judges, and that the costs be taxed three-fourths against the informant and one-fourth against the respondents.

All concur except HYDE, J., who concurs except as to ruling on Charge No. 8.